GOLDSTAR MEDICAL SERVICES, INC., ET AL. *v.*
DEPARTMENT OF SOCIAL SERVICES
(SC 18111)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 23—officially released September 23, 2008

*Jeffrey J. Mirman,* with whom, on the brief, was *Lisa A. Zaccardelli,* for the appellants (plaintiffs).

*Robert B. Teitelman,* assistant attorney general, with whom were *Linda A. Russo,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Theodore M. Doolittle,* assistant attorney general, for the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. The plaintiffs, Goldstar Medical Services, Inc. (Goldstar), and its owner and president,

Donald F. Bouchard,[1] appeal from the judgment of the trial court dismissing their administrative appeal from a five year suspension from the state medicaid program and an order of restitution issued by the defendant, the department of social services (department), for the plaintiffs' fraud and regulatory violations. We affirm the judgment of the trial court.

The record reveals the following facts, as found by the commissioner of social services, Patricia Wilson-Coker (commissioner), and procedural history. Goldstar was a Farmington based vendor and provider of oxygen and oxygen related services and supplies for the Connecticut medicaid[2] program from January 3, 1992, through October 15, 1999. Goldstar and the department were parties to a provider agreement that the parties first signed in 1992, and later renewed in 1996. Bouchard acted on behalf of Goldstar during this time.

Goldstar provided oxygen therapy services to medicaid recipients who were residents in nursing homes. Bouchard and Goldstar were responsible for providing patients with oxygen devices and services, such as,

---

[1] Where necessary, we refer to the plaintiffs individually by name.

[2] "Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396s, commonly known as the Medicaid Act, is a federal-state cooperative program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of medical care. . . . Although a state is not required to participate in the [m]edicaid program, once it chooses to do so it must develop a plan that complies with the [m]edicaid statute and . . . regulations [promulgated by the secretary of the United States Department of Health and Human Services]. . . . Federal medicaid regulations mandate that certain specified health services must be covered by a state plan; see 42 C.F.R. §§ 440.210 and 440.220; and allow states the option of covering other types of services. See 42 C.F.R. § 440.225.

"General Statutes § 17b-2 (8) designates the department as the state agency responsible for administering the state's medicaid program. The commissioner is authorized to promulgate regulations necessary for the administration of the program. See General Statutes § 17b-262." (Citations omitted; internal quotation marks omitted.) *Sikand* v. *Wilson-Coker*, 276 Conn. 618, 620–21, 888 A.2d 74 (2006).

for example, oxygen concentrators, portable oxygen systems and durable humidifiers, pursuant to their physicians' prescriptions. In order to receive oxygen therapy services, medicaid providers such as Goldstar were required to obtain and keep on file physician certifications (certifications) verifying that oxygen therapy was medically necessary for each respective patient.

As parties to the provider agreement with the department, Bouchard and Goldstar were required to "follow the laws, rules, regulations, policies, and amendments that govern the medicaid program," as well as to exhaust all proper and appropriate avenues for reimbursement before submitting claims to medicaid for payment. Upon Goldstar's enrollment in the medicaid program in January, 1992, it was issued a provider enrollment approval notice from the department, along with a manual specifying the policies to which Goldstar was required to adhere as a medicaid provider. As the president and owner of Goldstar, Bouchard was charged with ensuring that Goldstar adhered to the terms and conditions of the provider contract with the department, which included the training and supervision of Goldstar's staff in medicaid policy and ensuring compliance with all relevant laws and regulations.

One of the department's responsibilities in administering the medicaid program was to conduct audits of medicaid providers in the state, including oxygen therapy service providers like Goldstar. A full-scale audit includes a review by the department of "a sample of the universe of paid claims that are selected by computer using a random sampling method." In July, 1997, the department conducted an audit of Goldstar for the period from January 1, 1995, to June 30, 1997. Gloria D'Anzi, an associate accounts examiner with the department, was assigned to conduct the Goldstar audit.

D'Anzi conducted the audit utilizing the department's standard method, which was to select for review a sam-

ple from previously paid claims. Using standard audit sampling computer software, the department selected a sample of ninety-three paid claims out of a universe of 3496 paid claims during the January, 1995, through June, 1997, period. To complete the audit, D'Anzi reviewed department files, computerized databases and medical records from the nursing home facilities where medicaid recipients who received Goldstar's services resided. Additionally, D'Anzi visited a number of those nursing home facilities, and reviewed copies of various medical records, including physicians' orders, from certain facilities where medicaid recipients resided at the time Goldstar claimed to have furnished services for them.

A final report was issued at the completion of the audit, stating that sixty-nine out of ninety-three sample claims, constituting 74 percent of the claims, contained errors resulting in Goldstar's having received medicaid reimbursement in excess of that to which it was entitled. The audit report, as summarized by the commissioner, listed the following sixteen findings, or classes of violations of department regulations and policies pertaining to the billing for oxygen therapy services and equipment: "(1) original [certifications] were not on file; (2) third-party payment resources were not exhausted; (3) there were billings for non-covered oxygen usage; (4) [subsequent certifications] were not on file; (5) the [certifications] were not complete; (6) claims were submitted for the rental of portable oxygen systems without a physician's order on file; (7) claims were billed for portable oxygen systems for recipients who were not utilizing oxygen concentrators; (8) there was inappropriate billing of humidifiers; (9) claims were submitted for services involving portable oxygen equipment but nursing narratives indicated [that] the recipient's oxygen needs were met by stationary systems; (10) claims were made for overlapping dates of service; (11) claims

were submitted using procedure codes for oxygen therapy services that conflicted with services documented in the recipient's record; (12) Goldstar was paid by the nursing facility for oxygen used in portable oxygen units and Goldstar also billed the [department] for portable oxygen add-on units; (13) Goldstar billed [m]edicare and [m]edicaid for the same service; (14) there was no documentation supporting specific claims for portable oxygen services; (15) there was altered documentation; and (16) claims were submitted for services relating to portable oxygen equipment and humidifiers but there was no documentation that they were delivered." The report concluded that Goldstar received excess and unauthorized payments in the amount of $261,303.45 as a result of the violations. The department therefore withheld $83,250.17 in payments owed to Goldstar from the department and applied that amount to offset the overpayment to Goldstar, resulting in a net audit overpayment of $178,053.28.

Thereafter, in September, 1999, David Parrella, the department's director of medical care and administration, sent a letter to Goldstar giving notice that the department intended to revoke Goldstar's medicaid provider number, thus precluding Goldstar from providing services to medicaid recipients in the future. Bouchard responded to that letter and made a number of admissions relating to the final audit report. In particular, Bouchard admitted that Goldstar's record keeping was "inadequate," "incomplete" and "sloppy"; that Goldstar had submitted reimbursement claims to the department for portable oxygen systems that had not been certified by prescribing physicians; and that Goldstar incorrectly and inappropriately had submitted claims to the department for various oxygen therapy services. Bouchard denied, however, having knowledge of any alterations in documents necessary to request reimbursement for

services. The department thereafter terminated Gold-star's provider agreement.

In October, 2000, the department issued the plaintiffs a notice of regulatory violations and proposed sanctions, which was subsequently amended. A department hearing officer thereafter held an evidentiary hearing on the violations and proposed sanctions pursuant to § 17-83k-4a (b) (3) of the Regulations of Connecticut State Agencies.[3] The hearing took place on forty-seven various days between October 16, 2001, and June 18, 2002. On December 2, 2003, the hearing officer issued a proposed final decision, finding that the plaintiffs had engaged in fraud and abuse in violation of federal and state medicaid laws. Specifically, the hearing officer concluded that the plaintiffs had made false statements in order to obtain payment for services provided to medicaid recipients and had failed to adhere to conditions of the program, as set forth in state regulations. The hearing officer recommended that the commissioner order restitution from both Goldstar and Bouchard personally in the amount of $198,193.55, and suspend both plaintiffs from the medicaid program for five years. The plaintiffs and the department filed exceptions to the proposed final decision. The commissioner subsequently heard oral argument from the parties, and on January 12, 2005, issued a final decision that included 367 findings of fact and conclusions of law. The commissioner found that the plaintiffs had "violated federal and state [m]edicaid laws and rules and regulations in that they (1) knowingly and willfully made, or caused to be made, false statements or false representations of material fact for the purpose of claiming or determining payment for the services provided to [m]edicaid recipi-

---

[3] Section 17-83k-4a (b) (3) of the Regulations of Connecticut State Agencies provides: "The [d]epartment shall schedule an adjudicatory hearing as soon as practicable, which hearing shall be held in accordance with the provisions of the Uniform Administrative Procedure Act."

ents, which constitutes both fraud and abuse; and (2) failed to adhere to conditions of vendor participation in the program [specifically, §§ 17b-262-522 through 17b-262-533 and §§ 17-83k-1 through 17-83k-7 of the Regulations of Connecticut State Agencies]." The commissioner adopted the hearing officer's recommended order of restitution and suspension.

The plaintiffs thereafter appealed from the department's decision to the Superior Court pursuant to General Statutes § 4-183 (a). The trial court conducted a hearing and heard oral argument and thereafter issued a memorandum of decision, dismissing the plaintiffs' appeal as to all claims except with regard to the order of monetary sanctions against Bouchard personally.[4] This appeal followed.[5] The plaintiffs contend on appeal that trial court improperly concluded that: (1) the department had jurisdiction to sanction the plaintiffs pursuant to General Statutes § 17b-99 (c); (2) the department did not engage in "improper rule making" when it relied on documents other than certifications to verify prescriptions for oxygen therapy services, and when it extrapolated from a sample of paid claims the total amount of excess reimbursement that Goldstar had received; (3) the preponderance of the evidence standard, rather than the clear and convincing evidence standard, was appropriate for the commissioner's factual findings of fraud; (4) their constitutional right to due process was not violated by both the department's initial notice of charges and its subsequent amendments; (5) the commissioner properly could disregard the testimony of the plaintiffs' expert witness regarding

[4] The trial court reversed the commissioner's decision imposing monetary sanctions on Bouchard personally, finding a lack of legal authority for that sanction. The department has not appealed from that part of the judgment.

[5] The plaintiffs appealed from the judgment of the trial court to the Appellate Court. General Statutes §§ 4-184 and 51-197b (d). We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the alleged unreliability of medical records; and (6) substantial evidence existed in the record to support the commissioner's decision.

"We begin by articulating the applicable standard of review in an appeal from the decision of an administrative agency. Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. (UAPA)] . . . and the scope of that review is very restricted. . . . *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 773, 535 A.2d 1297 (1988). With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *Celentano* v. *Rocque*, 282 Conn. 645, 652, 923 A.2d 709 (2007).[6]

I

The plaintiffs first claim that the trial court improperly rejected two jurisdictional challenges made by them. They contend that the department lacked jurisdic-

---

[6] We note that we analyze all subsequent claims, except for that addressed in part VI of this opinion, using this standard of review, which will not be reiterated hereafter.

tion to sanction the plaintiffs because they were no longer "providers" within the meaning of § 17b-99 (c) at the time they were sanctioned. The plaintiffs further contend that the department lacked jurisdiction to suspend Bouchard personally from the state medicaid program.[7] We agree with the trial court that neither claim is meritorious.

## A

The plaintiffs first claim that the trial court improperly concluded that the department had jurisdiction to sanction them under § 17b-99 and the accompanying regulations despite the termination of Goldstar's provider agreement. The plaintiffs contend that because the department sought to impose sanctions after it had terminated Goldstar's provider agreement with the department, Goldstar was no longer a "provider" under § 17b-99 (c), and the department consequently had no legal basis for issuing sanctions. The department responds that Goldstar remained a "provider" because the department had issued a provider number to Goldstar, and the department's termination of the provider contract does not protect Goldstar from being subjected to sanctions. The department asserts that the termination of the provider agreement and the imposition of sanctions, including suspension from the program, are independent of each other, and that the department has authority to take both actions. We agree with the department.

---

[7] The plaintiffs also claim that the department lacks jurisdiction over them because § 17b-99 (c) allows for the suspension of a provider only after a criminal conviction is imposed. The plain language of the statute belies this position, however, because the provision allows for "administrative sanctions against providers . . . including suspension from the program, for *any violations of the rules, regulations, standards or law*." (Emphasis added.) General Statutes § 17b-99 (c). Because of the broad language employed in the statute, and because the plain language of the provision provides no indication whatsoever that a criminal conviction is a prerequisite to the assertion of jurisdiction, we conclude that the plaintiffs' claim is without merit.

The following additional undisputed facts are necessary to our resolution of this claim. Goldstar and the department entered into a standard form provider agreement on January 3, 1992, which subsequently was renewed on July 3, 1996. Bouchard executed the agreement on behalf of Goldstar. The agreement specifically provides that it can be terminated by mutual consent or by either party giving thirty days prior written notice of termination. No cause for termination is required. On or about October 15, 1999, after the department's preparation of the audit report and the exchange of correspondence between Parrella, the department's director of medical care and administration, and Goldstar, the department terminated Goldstar's provider agreement by giving notice as provided in the agreement.

The plaintiffs' claim presents a matter of statutory interpretation over which our review is plenary. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general

subject matter . . . ." (Internal quotation marks omitted.) *Bloomfield* v. *United Electrical, Radio & Machine Workers of America, Connecticut Independent Police Union, Local 14*, 285 Conn. 278, 286–87, 939 A.2d 561 (2008).

We begin with the language of the statute. Section 17b-99 (c) provides: "The [department] shall distribute to all vendors who are providers in the medical assistance program a copy of the rules, regulations, standards and laws governing the program. The [commissioner] shall adopt by regulation in the manner provided for in sections 4-166 to 4-176, inclusive, administrative sanctions against providers in the [m]edicare program or [m]edicaid program or aid to families with dependent children program or state-funded child care program or state-administered general assistance program or temporary family assistance program or state supplement to the federal Supplemental Security Income Program including suspension from the program, for any violations of the rules, regulations, standards or law. The commissioner may adopt regulations in accordance with the provisions of [the UAPA] to provide for the withholding of payments currently due in order to offset money previously obtained as the result of error or fraud. The department shall notify the proper professional society and licensing agency of any violations of this section."

"In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." *Norwich Land Co.* v. *Public Utilities Commission*, 170 Conn. 1, 4, 363 A.2d 1386 (1975); see *Sutton* v. *Lopes*, 201 Conn. 115, 121, 513 A.2d 139 (observing that we must construe statute in manner that will not thwart its intended purpose or lead to absurd results), cert. denied sub nom. *McCarthy* v. *Lopes*, 479 U.S. 964, 107 S. Ct. 466, 93 L. Ed. 2d 410 (1986). Moreover, "[w]e must avoid a construction that

fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. *Peck* v. *Jacquemin*, 196 Conn. 53, 63–64, 491 A.2d 1043 (1985). If there are two possible interpretations of a statute, we will adopt the more reasonable construction over one that is unreasonable." *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991).

Although § 17b-99 did not contain a definition of the term "provider" at the time when the events in the present case transpired,[8] the department's regulations did include such a definition. Section 17-83k-1 (b) (1) of the Regulations of Connecticut State Agencies defines " '[v]endor' and 'provider' [to] mean any person acting on his own behalf or on behalf of an entity and any entity furnishing goods or services." Unfortunately, however, this definition sheds no light on whether a provider can be sanctioned once its provider agreement is terminated. We turn, therefore, to a consideration of the entire text of § 17b-99 (c) to determine the legislative intent.

Section 17b-99 (c) begins by requiring that the department give all vendors a copy of the rules, regulations, standards and laws governing the medicaid program. It then requires the commissioner to adopt regulations regarding administrative sanctions against providers, including suspension from the program for "any violations of the rules, regulations, standards or law." General Statutes § 17b-99 (c). The statute next authorizes the commissioner to adopt regulations permitting the withholding of payments currently due providers in order "to offset money previously obtained as the result

---

[8] We note that subsection (d) of § 17b-99, which was added to the statute in 2005; see Public Acts 2005, No. 05-195, § 1; contains the following definition of provider: "For purposes of this subsection 'provider' means a person, public agency, private agency or proprietary agency that is licensed, certified or otherwise approved by the commissioner to supply services authorized by the programs set forth in said chapters."

of error or fraud." General Statutes § 17b-99 (c). The final provision of the subsection requires the department to notify the provider's "professional society and licensing agency of any violations of this section." General Statutes § 17b-99 (c).

The text of this subsection reveals a legislative intention to inform medicaid providers of all the rules and regulations governing the program, and to punish violators by imposing administrative sanctions, including suspension, and by notifying the licensing agencies of providers who fail to comply with the rules. The legislature's authorization for the commissioner to offset current amounts owed also evidences a legislative intent to recoup overpayments in a practical way. The plaintiffs' contention that a provider can place itself beyond the reach of these strong statutory sanctions and provisions simply by terminating its provider agreement on thirty days notice, defies logic and requires a construction of the statute that thwarts its intended purpose, and leads to an absurd result. As the trial court aptly concluded, "[i]t would defy common sense . . . to hold that the legislature intended a provider to be able to avoid an appropriate penalty by merely leaving the program."

Moreover, such an approach would be inconsistent with the audit process that is mandated by federal law and is meant to ensure compliance with medicaid rules and regulations. See 42 U.S.C. § 1396a (a) (37) (B) (requiring state medicaid plans to "provide for procedures [for] . . . postpayment claims review"); 42 C.F.R. § 447.253 (g) (stating that "[t]he [m]edicaid agency must provide for periodic audits of the financial and statistical records of participating providers"). Audits, by their inherent nature, are retrospective; they determine the accuracy of claims submitted and payments made after the fact. As in the present case, the department may not be able to determine whether a provider violated or abused program rules and regula-

tions until after the audit is concluded, months or years after medicaid reimbursement was paid. If the plaintiffs' interpretation of § 17b-99 (c) were to prevail, a provider could insulate itself from any sanction at all, even an order for restitution, simply by terminating the provider agreement as soon as it receives notice that an audit is to be conducted. As the trial court noted, the provider could "simply jump in and out of the program upon discovery of impropriety." We cannot conclude that our legislature could have intended to permit a result so incongruous with the clear intention of § 17b-99 (c). We therefore conclude that § 17b-99 (c) clearly and unambiguously requires only that in order to be sanctioned, the provider must have been acting as a provider *at the time of the alleged violations of medicaid rules and regulations.*[9] We reject the plaintiffs' proffered interpretation as illogical and absurd. Accordingly, the

---

[9] The plaintiffs also assert that this court's decision in *Stern* v. *Medical Examining Board*, 208 Conn. 492, 545 A.2d 1080 (1988), supports their position that the department lacked jurisdiction over Goldstar. In *Stern*, this court concluded that an administrative agency lacked jurisdiction to revoke the license of the plaintiff, a Connecticut physician, where the physician's license had expired by lapse of time prior to the initiation of the revocation proceedings. Id., 493. The court reasoned that the medical examining board lacked jurisdiction over the physician plaintiff because the authority of the board was contingent upon a showing that the plaintiff was a "physician," which was defined as "a person licensed pursuant to [chapter 370]." (Internal quotation marks omitted.) Id., 497. A license to practice medicine, however, is fundamentally different from the provider agreement to which Goldstar was a party in the present case. Indeed, possession of a valid license is required for a physician to be able to practice medicine at all, but the question of whether one is contractually obligated to provide medicaid services to another party has no bearing on one's capacity to provide those services as a general matter. Consequently, *Stern* is inapposite.

Additionally, we note that the plaintiffs' suggested interpretation conflates the important distinction that exists between one's status as a "provider" of medicaid services and being a party to a contract. See *Kelly Kare, Ltd.* v. *O'Rourke*, 930 F.2d 170, 174, 176 (2d Cir. 1991) (highlighting "critical difference" between one's status as health care provider and being party to contract to provide health care services, and noting that "[t]he refusal by a social services district to enter a contract with a qualified provider in no way affects the status of the provider").

department did not lack jurisdiction to sanction the plaintiffs by virtue of its termination of its provider contract with Goldstar.

## B

The plaintiffs also claim that the trial court improperly concluded that the commissioner had jurisdiction to impose the sanction of suspension from the medicaid program against Bouchard personally. Specifically, the plaintiffs claim that because Bouchard signed the provider agreement on behalf of Goldstar and not personally, he was not a provider who could be sanctioned under § 17b-99 (c), and the commissioner thus lacked jurisdiction under § 17b-99 (c) to suspend him. The department responds that the commissioner had authority to sanction Bouchard under § 17-83k-1 of the Regulations of Connecticut State Agencies, and that sanctions under the relevant state regulations are not limited to individuals that have a provider agreement with the department. We agree with the department.

A plain reading of the regulations that supplement § 17b-99 (c) provides the commissioner with the authority to suspend Bouchard personally from participation in the medicaid program. Section 17-83k-1 (b) (1) of the Regulations of Connecticut State Agencies defines " '[v]endor' and 'provider' [to] mean any person acting on his own behalf *or on behalf of an entity* and any entity furnishing goods or services." (Emphasis added.) As president of Goldstar, Bouchard acted "on behalf" of the company, and thus fits the definition of a vendor and provider for purposes of § 17b-99 (c). Additionally, § 17-83k-4a of the Regulations of Connecticut State Agencies authorizes the commissioner to impose administrative sanctions on vendors, providing that "[i]f the [d]epartment has reason to believe that a vendor has committed a violation, which violation has not resulted in a criminal conviction, the [c]ommissioner

may impose one or more of the administrative sanctions outlined in [§] 17-83k-5 of these [r]egulations . . . ." As provided in § 17-83k-5 (a) of the Regulations of Connecticut State Agencies, "[s]anctions . . . include . . . (2) [s]uspension from participation. . . ." These regulatory provisions, taken together, plainly provide the commissioner with the authority to suspend Bouchard.

The federal regulations that govern the medicaid program also suggest that the term "provider" is not limited to institutional entities, but can encompass individuals such as Bouchard as well. See 42 C.F.R. § 433.304 (stating that, in accordance with 42 C.F.R. § 400.203, "[p]rovider . . . means *any individual or entity* furnishing [m]edicaid services under a provider agreement with the [m]edicaid agency" [emphasis added]); 42 C.F.R. § 400.203 (The rule states that "[a]s used in connection with the [m]edicaid program, unless the context indicates otherwise . . . [p]*rovider* means either of the following: (1) For the fee-for-service program, *any individual or entity* furnishing [m]edicaid services under an agreement with the [m]edicaid agency. (2) For the managed care program, *any individual or entity* that is engaged in the delivery of health care services and is legally authorized to do so by the [s]tate in which it delivers the services." [Emphasis added.]). Thus the plain language of the applicable federal regulations dictates that a "provider" can be either an individual or institutional entity.

The nature of the medicaid program as a state and federal cooperative endeavor also suggests that the commissioner possessed the authority to suspend Bouchard under the present circumstances. As we have stated previously, because medicaid is a federal and state cooperative program, "[a]lthough a state is not required to participate in the [m]edicaid program, once it chooses to do so *it must develop a plan that complies with the [federal] [m]edicaid statute and . . . regula-*

*tions . . . ."* (Emphasis added; internal quotation marks omitted.) *Sikand* v. *Wilson-Coker,* 276 Conn. 618, 621, 888 A.2d 74 (2006). Indeed, 42 C.F.R. § 1002.100 provides that the federal regulations constitute "minimum requirements," and that "[t]he [state] agency may impose broader sanctions if it has the authority to do so under [s]tate law." One such federal regulation with which state agencies must comply is 42 C.F.R. § 1002.210, which provides in relevant part that a state "must have administrative procedures in place that enable it to exclude an individual or entity for any reason for which the Secretary [of Health and Human Services] could exclude such individual or entity under parts 1001[10] or 1003 of this chapter. . . ." Thus, without such administrative procedures in place, the department would not be in compliance with federal law. Consequently, 42 C.F.R. § 1002.210 informs our reading of § 17b-99 (c) because it would be illogical to interpret a provision of our statutory scheme so as to violate federal law. See *Norwich Land Co.* v. *Public Utilities Commission,* supra, 170 Conn. 4 (noting that when "construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended").

Finally, we note the unworkable results that necessarily would follow from the plaintiffs' interpretation

[10] Section 1001.1051 (a) of title 42 of the Code of Federal Regulations provides in relevant part: "The [office of the inspector general] may exclude any individual who . . . (2) [i]s an officer or managing employee (as defined in section 1126 (b) of the [Social Security] Act) of such [a sanctioned] entity." " '[M]anaging employee' " is defined by 42 U.S.C. § 1320a-5 (b) as "with respect to an entity, an individual, including a general manager, business manager, administrator, and director, who exercises operational or managerial control over the entity, or who directly or indirectly conducts the day-to-day operations of the entity." We note that although Goldstar is not a "sanctioned entity" as the term is defined in 42 C.F.R. § 1001.1051, the significance of the provision for the present case is that it requires that states have provisions in place to exclude *individuals* under certain circumstances.

of § 17b-99 (c). If the plaintiffs' interpretation of the provision were to prevail, an individual in Bouchard's position would be free to defraud federal and state health care programs in perpetuity by simply forming new corporations with different provider numbers. Because it is impossible to imagine that the legislature intended such a result when it enacted the strong provisions of § 17b-99 (c), we therefore conclude that the term "provider" in § 17b-99 (c), as further defined in § 17-83k-1 (b) (1) of the Regulations of Connecticut State Agencies, clearly and unambiguously provided the commissioner with jurisdiction to suspend Bouchard.

II

The plaintiffs next contend that the trial court improperly rejected the plaintiffs' claim that the department engaged in "improper rule making" when: (1) the commissioner relied on documents other than those specified in the relevant regulations to determine the authenticity of various documents submitted by the plaintiffs for medicaid reimbursement purposes; and (2) the department employed an improper method of assessing Goldstar's compliance with medicaid regulations.[11]

---

[11] The plaintiffs also contend that the trial court improperly rejected their claim that the department improperly had imposed a limitation on the minimum liter flow rate of oxygen for which the department would provide reimbursement. We decline to review this claim, however, because it is inadequately briefed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008). In the present case, the plaintiffs have cited no cases in support of this claim, and have provided only a cursory analysis in support of their contention. We therefore decline to review this claim.

A

The plaintiffs first assert that the trial court improperly rejected their claim that the commissioner had engaged in improper rule making when she relied on documents other than certifications to verify prescriptions for oxygen therapy services. Put another way, the plaintiffs contend that without a regulation expressly so providing, the commissioner improperly looked to documents other than the certifications required under the medicaid regulations to determine the accuracy of the certifications. More specifically, the plaintiffs contend that the trial court improperly concluded that it was permissible for the commissioner to review documents, such as physician order sheets, which are not specified in the medicaid regulations, in order to determine the validity of the certifications. The plaintiffs further contend that because § 17-134d-84 (a) (3) of the Regulations of Connecticut State Agencies requires that a certification be used for reimbursement purposes for oxygen services under the state medicaid program, the department may not rely on any other documentation to verify the authenticity of the certifications submitted. The department responds that, although the certification is required for reimbursement for oxygen services, the commissioner may examine other evidence to determine whether the certifications submitted were altered or falsified. Specifically, the department responds that although § 17-134d-84 (a) (3) of the Regulations of Connecticut State Agencies requires a valid and fully completed certification for medicaid reimbursement, nothing in the relevant federal or state law precludes the commissioner from examining other relevant evidence to ensure that the certifications are valid. We agree with the department.

The following additional facts, as found by the commissioner, are necessary for our resolution of this issue. Pursuant to state regulations, the department requires

that all initial physician orders for oxygen therapy placed by nursing home facilities to Goldstar that are billed directly to the department are required to be accompanied by a certification, which is to be completed and signed by the prescribing physician. During the course of the administrative hearing, the commissioner compared the certifications that Goldstar had submitted to other available documentation to determine the accuracy of the certifications submitted by Goldstar. For example, the commissioner visually inspected a certification that Goldstar had submitted as an exhibit and found that portions of the certification had been altered. The commissioner also examined physician order sheets and other documents from patients' medical files that had been admitted as exhibits at the hearing and determined that discrepancies existed between these documents and the certification that Goldstar had submitted to the department for reimbursement purposes. On the basis of this other documentation, the commissioner found that certifications submitted by Goldstar to the department had been altered or falsified by the plaintiffs.

We begin with the medicaid regulation that establishes the certifications as the key document confirming the right to medicaid reimbursement. Section 17-134d-84 (a) (3) of the Regulations of Connecticut State Agencies provides in relevant part: "The [c]ertification of [m]edical [n]ecessity form . . . shall be used for all orders of oxygen therapy. This fully completed form must be signed by the prescribing physician. . . ." In order to verify the accuracy of the certifications in terms of the services rendered and the physician's order for it, the commissioner looked to documents in the medicaid patient's medical files and compared orders and notes in the file to the certification. The use of such evidence is permitted under our state statutes and regulations. See General Statutes § 4-178 (noting that "[i]n contested

cases: [1] [a]ny oral or documentary evidence may be received"); Regs., Conn. State Agencies § 17-210a-26 ("[a] . . . [a]ny oral or documentary evidence may be received . . . [and] [b] . . . [d]ocumentary evidence may be received at the discretion of the commissioner or presiding officer in the form of copies or excerpts, if the original is not found readily available").

Moreover, federal case law establishes that a fact finder may examine evidence other than certifications to determine whether the certifications submitted for reimbursement were valid, and that a comparison with such documentation is a standard and recognized method for testing the accuracy of the certification. See, e.g., *United States* v. *Picciotti*, 40 F. Sup. 2d 242, 246 (D.N.J. 1999) (medicare provider convicted for filing false certifications; lack of authenticity of certifications established by examining contemporaneous noncertification medical documentation), aff'd, 229 F.3d 1140 (3d Cir. 2000).

The case cited by the plaintiffs in support of their claim is inapposite. In *Salmon Brook Convalescent Home* v. *Commission on Hospitals & Health Care*, 177 Conn. 356, 368, 417 A.2d 358 (1979), this court concluded that guidelines applied as substantive rules that had a substantial impact on those who appeared before an agency need to be adopted as regulations promulgated under the UAPA. The case had nothing to do with the manner in which an administrative agency may verify the accuracy of certifications submitted to the agency. The plaintiffs cite no authority, and we have found none, supporting their proposition that an agency must issue a regulation that authorizes reference to other documentation in order to test the accuracy of the certification.

B

The plaintiffs next claim that the trial court improperly concluded that the commissioner was permitted

to extrapolate from a sample of paid claims the total amount of excess reimbursement Goldstar had received. Specifically, the plaintiffs contend that the department was not authorized to use an extrapolation method because state regulations do not authorize the use of this process, and the federal regulation on which the trial court relied is not applicable. The department responds that the use of a method of extrapolation is appropriate, legal and sanctioned by federal regulations. We agree with the department.

The following additional facts, as found by the commissioner, are relevant to this issue. The department conducted a full-scale audit of Goldstar for the period from January 1, 1995, through June 30, 1997. During this period, the department provided medicaid reimbursement to Goldstar that totaled $479,693 for 3496 claims. During the course of the full-scale audit, the department selected by computer a random sample of ninety-three claims to be fully audited. As explained in the audit report, the department extrapolated from this sample to arrive at the total amount that Goldstar was overpaid using the following procedure: "Errors found in the sample were extrapolated to the universe using a mean per unit estimate. The amount of error was calculated for each sample claim. The average error per sample was then calculated. The average error was multiplied by the total number of paid claims to determine the extrapolated error amount." Extrapolating from the sample to the total number of claims for the audited period, the department determined that Goldstar had received excess medicaid reimbursement in the amount of $261,303.45.

It is well established that proof of damages through the use of statistics and statistical sampling has been endorsed in numerous cases involving medicare and

medicaid overpayments.[12] "In *Ratanasen* v. *[California]*, 11 F.3d 1467 [1471] (9th Cir. 1993), and *Yorktown Medical Laboratory, Inc.* v. *Perales*, 948 F.2d 84, 89–90 (2d Cir. 1991), the Ninth and Second Circuits rejected [the] plaintiffs' due process challenges to the use of statistical extrapolation from a sample to calculate the amount of [m]edicaid overpayments. Likewise, the District of Columbia Circuit upheld [an agency's] disallowance of claims based on extrapolations from audits from a random selection of [m]edicare claims. *Chaves County Home Health Service* v. *Sullivan*, 931 F.2d 914 (D.C. Cir. 1991), cert. denied, 502 U.S. 1091, 112 S. Ct. 1160, 117 L. Ed. 2d 408 (1992). The Seventh Circuit, in a recoupment case, agreed that 'the use of statistical samples had been recognized as a valid basis for findings of fact in the context of [m]edicaid reimbursement.' *Illinois Physicians Union* v. *Miller*, 675 F.2d 151, 155 (7th Cir. 1982)." *United States* v. *Cabrera-Diaz*, 106 F. Sup. 2d 234, 240 (D.P.R. 2000). Indeed, in *Illinois Physicians Union*, the Seventh Circuit emphasized the importance of the extrapolation method in medicaid enforcement: "The [Illinois department of public aid] processes an enormous number of claims and must adopt realistic and practical auditing procedures. We agree with the [D]istrict [C]ourt's conclusion that, in view of the enormous logistical problem of [m]edicaid enforcement, statistical sampling is the only feasible

---

[12] We note that, subsequent to the proceedings at issue in the present case our legislature amended § 17b-99 explicitly to sanction the use of the extrapolation method in certain circumstances by adding subsection (d) to the statute. See Public Acts 2005, No. 05-195, § 1. That section currently provides in relevant part as follows: "A finding of overpayment or underpayment to a provider . . . shall not be based on extrapolated projections unless (A) there is a sustained or high level of payment error involving the provider, (B) documented educational intervention has failed to correct the level of payment error, or (C) the value of the claims in aggregate exceeds one hundred fifty thousand dollars on an annual basis." General Statutes § 17b-99 (d) (3).

method available." *Illinois Physicians Union* v. *Miller*, supra, 157.

Moreover, a federal regulation mandates that the department conduct a statistics based evaluation of medicaid providers. See 42 C.F.R. § 456.22 ("[t]o promote the most effective and appropriate use of available services and facilities the [m]edicaid agency must have procedures for the on-going evaluation, on a sample basis, of the need for and the quality and timeliness of [m]edicaid services"). The plaintiffs assert that this provision is not applicable in the present case because the regulation appears in the section of the federal regulations that deals with the evaluation of the need for services, such as inpatient care and treatment in an intermediate care facility. The plain language of 42 C.F.R. § 456.21 contradicts this claim, however, because this provision, which is entitled "[s]cope," provides that "[t]his subpart prescribes utilization control requirements applicable to *all services* under a [s]tate plan." (Emphasis added.) See 42 C.F.R. § 456.1 (a) ("[t]his part prescribes requirements concerning control of the utilization of [m]edicaid services including . . . [1] [a] statewide program of control of the utilization of all [m]edicaid services"). Additionally, 42 C.F.R. § 456.1 provides that 42 C.F.R. § 456.22 relates to 42 U.S.C. § 1396a (a), which provides in relevant part: "A [s]tate plan for medical assistance must . . . (30) (A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . and to assure that payments are consistent with efficiency, economy, and quality of care . . . ." Because 42 U.S.C. § 1396a (a) concerns the methods and procedures for payment in state plans, its accompanying regulations, namely 42 C.F.R. § 456.22, are applicable in the present case.

Additional federal regulations governing the medicaid program suggest that the commissioner properly

made use of the extrapolation method in the present case. Specifically, federal regulations indicate that the federal Department of Health and Human Services intends for state agencies to monitor closely whether federal funds are allocated appropriately. For example, 42 C.F.R. § 455.13 (a) requires state agencies to have in place "[m]ethods and criteria for identifying suspected fraud cases . . . ." See 42 C.F.R. § 455.12. Additionally, 42 C.F.R. § 455.1 (a) (2) requires that states "[h]ave a method to verify whether services reimbursed by [m]edicaid were actually furnished to recipients." Simultaneously, however, the United States Department of Health and Human Services has recognized the difficulty of enforcement of medicaid claims on a case-by-case basis. Specifically, in an administrative ruling entitled "Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers," the Secretary of Health and Human Services (secretary) concluded that, "[i]n view of the enormous logistical problems in determining massive overpayments in social welfare programs," statistical sampling represents the *only feasible method available*" of recouping overpayments in the medicaid program. (Emphasis added.) United States Dept. of Health and Human Services, Health Care Financing Administration Ruling No. 86-1 (February 20, 1986) p. 5. The secretary concluded that "the use of statistical sampling to project an overpayment is consistent with the [federal government's] common law right to recover overpayments, the [m]edicare statute, and the [Department of Health and Human Services'] regulations," and does not constitute a denial of due process on the part of a provider. Id., p. 12. The secretary continued that "[n]either the statute nor regulations require that a case-by-case review be conducted in order to determine that a provider or supplier has been overpaid and to determine the amount of overpayment." Id.

Federal regulatory authority thus requires states to ensure that medicaid funds are allocated appropriately

and simultaneously recognizes the impracticality of discrete assessment of claims in an effort to recoup overpayments where a multitude of claims is involved. Given the nature of the medicaid program as a state and federal cooperative regime, it would be incongruous to interpret our statutory scheme to disallow a practice that is recognized at the federal level as the only feasible method of recouping funds that improperly have been procured. See *Sikand* v. *Wilson-Coker*, supra, 276 Conn. 620–21 (observing that "once [a state] chooses to [participate in the medicaid program] it must develop a plan that complies with the [federal] [m]edicaid statute and . . . regulations" [internal quotation marks omitted]). Accordingly, we conclude that the trial court properly concluded that the department's use of the extrapolation method was appropriate.

III

The plaintiffs next claim that the trial court improperly concluded that the commissioner properly used the preponderance of the evidence standard, rather than the clear and convincing evidence standard, for her factual findings of fraud. The plaintiffs assert that, because the department's claims against the plaintiffs were rooted in fraud, the department was required to prove its case by clear and convincing evidence. The department responds that the commissioner and the trial court properly concluded that the department was required to prove its case by the preponderance of the evidence because that standard applies in Connecticut administrative cases, including those involving fraud and severe sanctions. We agree with the department.

The following additional facts are necessary for our resolution of this claim. The commissioner determined that the preponderance of the evidence standard was the appropriate standard of proof to be applied at the administrative level, and determined that the depart-

ment had proven the allegations against the plaintiffs by that standard. She further noted, however, that although the preponderance of the evidence standard was the "applicable standard," "the evidence of fraud presented in this case is so overwhelming" that the department would have been able to satisfy the clear and convincing standard of proof as well. The trial court concluded that the commissioner properly had applied the preponderance of the evidence standard.

We begin by noting that, in this state, proof by preponderance of the evidence is the "ordinary civil standard of proof . . . ." *Mallory* v. *Mallory*, 207 Conn. 48, 52, 53, 539 A.2d 995 (1988); see *State* v. *Davis*, 229 Conn. 285, 295–96, 641 A.2d 370 (1994) (noting that "the general rule [in this state is] that when a civil statute is silent as to the applicable standard of proof, the preponderance of the evidence standard governs factual determinations required by that statute"). The plaintiffs accurately state, however, that the clear and convincing standard is the appropriate standard of proof in *common-law* fraud cases. See *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 163, 681 A.2d 293 (1996) ("the appropriate standard of proof for the party who seeks to prevail in a civil fraud action is clear and convincing evidence").

In federal administrative proceedings, the preponderance of the evidence standard is applicable, even when the issue is the commission of fraud. The United States Supreme Court has held that the preponderance of the evidence standard traditionally applies in administrative cases in the absence of a legislative directive to the contrary. See *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 389–90, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) (adopting preponderance standard for fraud allegations in administrative hearing); *Steadman* v. *Securities & Exchange Commission*, 450 U.S. 91, 95, 102, 101 S. Ct. 999, 67 L. Ed. 2d 69 (1981) (upholding use of

preponderance of evidence standard in Securities and Exchange Commission administrative proceedings concerning alleged violations of antifraud provisions where possible sanctions included order permanently barring individual from practicing profession); see also *Jones for Jones* v. *Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (noting that "preponderance of the evidence . . . is the default standard in civil and administrative proceedings" and adopting preponderance of evidence standard in administrative proceeding to determine entitlement to certain benefits under Social Security Act where standard not prescribed by case law or statutes).

The department's own regulations also suggest by negative implication that the preponderance of the evidence standard is the appropriate standard of proof in the present case. The department has promulgated a regulation specifically requiring that the clear and convincing standard be employed in certain fraud cases. See, e.g., Regs., Conn. State Agencies § 17b-749-22 (a) (1) ("The department shall have the option of referring a case for an administrative disqualification hearing if the [child care assistance program] administrator determines that an overpayment was caused as the result of an intentional error by the parent to commit fraud in obtaining benefits from [the child care assistance program]. The purpose of the administrative disqualification hearing is to determine if the error was intentional. The standard of proof that the administrative hearing officer shall use in making his or her decision is by *clear and convincing evidence*." [Emphasis added.]). The department has not specified a particular standard of proof in cases relating to medicaid fraud, however, and we reasonably infer that the default standard of a fair preponderance of the evidence therefore is applicable.

The plaintiffs in the present case have not cited any relevant statute or regulation that requires the clear and

convincing standard of proof to be applied in situations involving medicaid fraud at the administrative level. Their reliance on cases addressing the standard of proof in common-law fraud cases is misplaced. See, e.g., *Billington* v. *Billington*, 220 Conn. 212, 215, 595 A.2d 1377 (1991) (action to open judgment of dissolution of marriage due to alleged fraudulent concealment of value of marital property); *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 661, 504 A.2d 1047 (action for fraudulent concealment of cause of action), cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986); *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 461, 242 A.2d 708 (1968) (action for fraudulent interference with business expectancy). The plaintiffs have not pointed to a single case in the administrative arena that requires clear and convincing evidence to prove fraud. In the absence of state legislation prescribing an applicable standard of proof, we conclude that the preponderance of the evidence standard is the appropriate standard of proof in administrative proceedings, including those in which a determination of fraud may be made.

IV

The plaintiffs next contend that the trial court improperly rejected their claim that their constitutional right to due process was violated in two ways: (1) the initial notice of regulatory violations that they received inadequately identified the specific violations alleged; and (2) the department was permitted to amend certain documents to add new charges after the commencement of the administrative hearing.

A

The plaintiffs first assert that the trial court improperly concluded that the notice of charges that the plaintiffs received was adequate to comply with due process. Specifically, the plaintiffs assert that the second amended notice of regulatory violations and proposed

sanctions violated due process standards because it failed to: (1) set forth a particular statute that the plaintiffs were said to have violated; and (2) identify particular dates on which the plaintiffs allegedly committed such violations. The department responds that it particularized numerous examples of the plaintiffs' violations of the standards to which they had agreed to adhere, and that the notice of charges was sufficiently detailed to comply with due process requirements. We agree with the department.

The following additional facts are relevant to the plaintiffs' claim. By letter, dated October 23, 2000, the department notified the plaintiffs of the pending charges against them in its initial notice of regulatory violations and proposed sanctions. The charging document is thirty-nine pages long and contains the department's report of the Goldstar audit as an appendix. The notice itself explicitly refers to § 17b-99 (c) and references numerous particular regulations that the plaintiffs allegedly had violated. The department also included a copy of the regulations that the plaintiffs were charged with violating. The department issued its first amended notice of regulatory violations and proposed sanctions on December 7, 2000, and its second amended notice of regulatory violations and proposed sanctions on January 17, 2001.[13] These subsequent notices contained relatively little new material and did not alter significantly the general nature of the charges against Goldstar.[14]

[13] We note that the department furnished much of the information that serves as a basis for the plaintiffs' due process claim in response to the plaintiffs' motion for a more definite and detailed statement, which was dated December 22, 2000.

[14] For example, the most significant change introduced by the department's second notice of regulatory violations is that it added the following sentence to paragraph fifteen, which charged Goldstar with failing to maintain medical necessity documentation: "Specifically, Goldstar failed to maintain original [certifications], failed to maintain [certifications] on file, and failed to ensure [that certifications] included adequate and sufficient medical information, including but not limited to, diagnoses, results of laboratory tests and justifi-

"[D]ue process [in the administrative hearing context] requires that the notice given must . . . fairly indicate the legal theory under which such facts are claimed to constitute a violation of the law." (Internal quotation marks omitted.) *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 535, 560 A.2d 403 (1989). "[T]he fundamental reason for the requirement of notice is to advise all affected parties of their opportunity to be heard and to be apprised of the relief sought." *Slagle* v. *Zoning Board of Appeals*, 144 Conn. 690, 693, 137 A.2d 542 (1957); *Winslow* v. *Zoning Board*, 143 Conn. 381, 389, 122 A.2d 789 (1956). "[N]otice of a hearing is not required to contain an accurate forecast of the precise action which will be taken on the subject matter referred to in the notice. It is adequate if it fairly and sufficiently apprises those who may be affected of the nature and character of the action proposed, so as to make possible intelligent preparation for participa-

cation for the use of portable oxygen systems." Additionally, the second notice of violations made the following minor changes to the document's final substantive paragraph, paragraph twenty-five, which detailed the sanctions to be imposed, deleting the sum of "excess and unauthorized payments" that Goldstar had allegedly received, while the first notice stated that this sum had totaled "approximately $261,303.45." Also, section (b) of paragraph twenty-five in the second notice was somewhat less detailed than the corresponding section of the first notice, changing from "[e]ntry of an order against Goldstar and [Bouchard] ordering that restitution be made to the [d]epartment in the amount of $261,303.45 with interest at the rate provided by statute" to "[e]ntry of an order against Goldstar and [Bouchard] ordering restitution to the [d]epartment for all overpayments made by the [d]epartment, with interest at the rate provided by statute." The second notice also added a new section (c) to paragraph twenty-five, which provided as a sanction "[s]uch other limitation on Goldstar's participation as a vendor and provider of oxygen therapy to [m]edicaid beneficiaries as the commissioner shall determine is appropriate." Finally, the department's second notice made various other technical changes, such as: the deletion of certain references to state regulations; the substitution of certain terminology, such as the use of the term "beneficiaries" instead of "recipients" to describe the parties for whom Goldstar had performed services in the second notice; and the addition of the statement in the second notice that Goldstar acted as a "vendor and provider" rather than simply as a "provider" of oxygen and oxygen related services and supplies.

tion in the hearing . . . ." (Internal quotation marks omitted.) *Hartford Electric Light Co.* v. *Water Resources Commission*, 162 Conn. 89, 110, 291 A.2d 721 (1971).

Due process in the administrative context is prescribed by the UAPA. General Statutes § 4-177 (b) requires that notice of a contested hearing include the following: "(1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; and (4) a short and plain statement of the matters asserted." Additionally, the statute provides that "[i]f the agency or party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished." General Statutes § 4-177 (b).

In the present case, it is clear that the department has complied with the strictures of § 4-177 (b) in notifying the plaintiffs of the charges against them. In particular, contrary to the plaintiffs' assertion, the department's second amended notice of regulatory violations and proposed sanctions explicitly referenced "the particular sections of the statutes and regulations involved" as required by § 4-177 (b) (3), because the notice stated that the department asserted jurisdiction pursuant to § 17b-99 (c). Although the notice did not detail a particular statutory section that the plaintiffs were charged with violating, the notice of charges provided by the department did reference, and provide copies of, the numerous regulations that the plaintiffs were charged with violating. The notice provided a more than sufficient account of the nature of the charges alleged. See *Rivera* v. *Liquor Control Commission*, 53 Conn. App. 165, 173, 728 A.2d 1153 (1999)

(concluding that plaintiff received adequate notice where notification of charges cited relevant *chapter* of General Statutes and referenced issues to be considered).[15]

Perhaps even more significantly, the record reveals that the plaintiffs were well aware of the charges against them, which further supports the trial court's conclusion that the department did not violate the plaintiffs' due process rights. See *Grimes* v. *Conservation Commission*, 243 Conn. 266, 274, 703 A.2d 101 (1997) (observing that "[t]he purpose of administrative notice requirements is to allow parties to prepare intelligently for the hearing" [internal quotation marks omitted]). Even before the department issued its initial notice of regulatory violations and proposed sanctions, Bouchard had drafted and sent the department his letter, which reiterated the department's audit findings and provided brief explanations for each of the sixteen findings addressed. Moreover, Bouchard was so familiar with the charges against him that he was able to draft a "plan of correction," in which he detailed for the department the various procedures that he planned to implement to address many of Goldstar's shortcomings as identified in the audit. This plan of correction preceded the department's initial notice of regulatory violations and proposed sanctions. We therefore conclude that the trial court properly determined that the plaintiffs were accorded their due process rights with respect to the initial notice of charges. Id., 273.

B

The plaintiffs next claim that the trial court improperly concluded that they had adequate notice of the charges they faced in light of the fact that the department was permitted to amend certain documents after

---

[15] The notice did not set forth particular dates when the violations occurred, but such dates are not required under § 4-177 (b).

commencement of the hearing. Specifically, the plaintiffs assert that they were denied due process because the department submitted two supplemental responses to the plaintiffs' request for a more definite and detailed statement and the third amended notice of regulatory violations after the administrative hearing had commenced. The department responds that the plaintiffs' due process rights were not violated because the amendments to which the plaintiffs refer concerned claims that were virtually identical in character to those charges of which the plaintiffs already were aware. We agree with the department.

The following additional facts pertain to the resolution of this claim. The plaintiffs received the second amended notice of regulatory violations and proposed sanctions in January, 2001, approximately ten months before the start of the administrative hearing. The department submitted a third amended notice of regulatory violations in January, 2002. Specifically, paragraph nineteen of both the second and third amended notices allege that Goldstar engaged in the practice of "upcoding," which occurs when "a provider selects a code to maximize reimbursement when such code is not the most appropriate descriptor of the service or where the code is for a higher-level service than that which would be authorized . . . ." The second amended notice detailed a particular way in which Goldstar engaged in this practice: "Goldstar submitted claims utilizing procedure codes for oxygen therapy services that conflicted with services documented in the recipient's medical record. Specifically, Goldstar billed for oxygen type and flow rates that were in excess of that actually provided to the recipient." The third amended notice addressed the same subject matter but provided additional detail. The corresponding paragraph in the third amended notice provides as follows: "Goldstar submitted claims utilizing procedure codes for oxygen therapy

services that conflicted with services documented in the recipient's medical record or did not meet the [d]epartment's prior authorization criteria for medical necessity. Specifically, Goldstar billed for oxygen type and flow rates that were procured through false or negligent misrepresentation to the [d]epartment and/or were in excess of that actually provided to the recipient." Additionally, the third and fourth supplemental responses to the request for more definite and detailed statements related to invalid certifications. Specifically, the department's third supplemental response cited two individuals for whom Goldstar had ordered oxygen therapy services even though the treating physician had discontinued a prescription for such services or had prescribed services on an "emergency use" or "as the situation demands" basis only. Additionally, the department's third supplemental response cited an individual for whom Goldstar had submitted claims for oxygen therapy services "with procedure codes for oxygen type and flow rates that were in excess of that actually provided to the recipient." The department's fourth supplemental response to the plaintiffs' request for a more definite and detailed statement: cited certain documentation that the department asserts previously had been made available to the plaintiffs, such as state agency regulations; detailed specific instances in which the plaintiffs had allegedly falsified numerous certifications; referenced instances in which the plaintiffs had allegedly improperly sought reimbursement for oxygen services that the plaintiffs had provided; and cited instances in which the plaintiffs had submitted claims for oxygen therapy services "covered under overlapping dates of service."

A careful review of the record reveals that the materials that form the basis of the plaintiffs' due process claim did not contain significant new charges such that the plaintiffs were deprived of their opportunity to pre-

pare intelligently for the hearing. See *Grimes* v. *Conservation Commission*, supra, 243 Conn. 274. For example, the record reveals that the second and third amended notices of regulatory violations and proposed sanctions are virtually identical, and that the changes engendered by the third amended notice referred to issues that previously had been raised in the second amended notice. Additionally, because the third and fourth supplemental responses to the request for more definite and detailed statements related to illegitimate certifications, these documents related to charges of the same general nature as those offenses about which the plaintiffs previously had been apprised. Finally, the plaintiffs had ample time to respond to the materials presented to them after the commencement of the hearing, as the last of the documents that form the basis of their due process claim is dated January 22, 2002, four months before the plaintiffs' first witness testified at the hearing.

Even if we were to conclude that the department's notice was somehow inadequate, however, we note that "not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown." (Internal quotation marks omitted.) *Murach* v. *Planning & Zoning Commission*, 196 Conn. 192, 205, 491 A.2d 1058 (1985); accord *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 94, 596 A.2d 374 (1991). In the present case, although the plaintiffs claim that "[s]ubstantial rights were prejudiced as a result of the [department's] actions" because they were "forced to defend against the assessment of new penalties not included in the audit," they have failed to provide any specifics as to how the notice they received affected their rights at the hearing, such as, for example, being deprived of a meaningful opportunity for cross-examination of witnesses. We therefore conclude that the trial court

properly determined that the plaintiffs' due process rights were not violated in this second respect.

## V

The plaintiffs next challenge the trial court's rejection of their claim that the commissioner improperly disregarded the testimony of the plaintiffs' expert witness, Anne Spenard, regarding the unreliability of medical records, because Spenard's testimony was not rebutted by any countervailing expert testimony. The plaintiffs contend that, because the commissioner lacked her own expertise or knowledge of the issues before her, it was improper to disregard the only expert testimony available on the issue of the reliability of the medical records. The plaintiffs rely on the Appellate Court's decision in *Tanner* v. *Conservation Commission*, 15 Conn. App. 336, 341, 544 A.2d 258 (1988), in which that court stated that "an administrative agency . . . must not disregard the only expert evidence available on the issue when the commission members lack their own expertise or knowledge." The department disagrees, contending that the commissioner was not obligated to credit Spenard's testimony.

The following additional facts are necessary for our resolution of this issue. The plaintiffs offered the testimony of Spenard, who testified about medical documentation in nursing homes in Connecticut. Spenard testified that, in her experience, she had observed that inconsistencies or inaccuracies often existed in the records kept by nursing homes. Spenard reviewed the records of several individual patients whose medical records were introduced into evidence at the hearing in the present case, and uncovered inconsistencies in these records. Spenard therefore testified that, in her opinion, the nursing home medical records relied on by the department were unreliable. The commissioner did not find Spenard's testimony to be convincing, how-

ever, concluding that her testimony "did not shed any light on the charges . . . ." To the contrary, the commissioner found that the record keeping procedures employed by the nursing homes involved in the case were consistent, and she concluded that Spenard's testimony "could not explain the overwhelming amount of irregularities, alterations, and falsifications in the billing documents" submitted to the department by the plaintiffs.

It is well established that it is the exclusive province of the trier of fact to make determinations of credibility, crediting some, all, or none of a given witness' testimony. *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005). Additionally, "[a]n administrative agency is not required to believe any witness, even an expert. *Feinson* v. *Conservation Commission*, 180 Conn. 421, 427–28, 429 A.2d 910 (1980); *Gulf Oil Corporation* v. *Board of Selectmen*, 144 Conn. 61, 65–66, 127 A.2d 48 (1956); *Jaffe* v. *State Department of Health*, 135 Conn. 339, 64 A.2d 330 (1949). Nor is an agency required to use in any particular fashion any of the materials presented to it as long as the conduct of the hearing is fundamentally fair. *Miklus* v. *Zoning Board of Appeals*, 154 Conn. 399, 225 A.2d 637 (1967)." *Manor Development Corp.* v. *Conservation Commission*, 180 Conn. 692, 697, 433 A.2d 999 (1980). "Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 263, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006).

The plaintiffs' reliance on *Tanner* v. *Conservation Commission*, supra, 15 Conn. App. 336, is misplaced. In

that case, the Appellate Court affirmed the trial court's ruling that, in dealing with complex or technical issues, the conservation commission could not ignore the testimony of expert witnesses and rely solely on its own insight. In *Tanner*, the plaintiffs' four experts had agreed unanimously that the proposed project, a single-family residence, could be built on the site in question, but the defendant conservation commission disagreed, concluding that there was a disparity among the testimony of the experts. Id., 338. Thereafter, the trial court sustained the plaintiffs' appeal, concluding that the conservation commission had acted without substantial evidence in declining to credit the testimony of the plaintiffs' experts. Id. The Appellate Court affirmed the trial court's ruling, reasoning that no disagreement had in fact existed among the experts and that "[t]he commission created a disparity among the experts where none existed." Id.

More recently, however, our Appellate Court has noted that "[s]ince *Tanner* . . . our appellate courts have handed down decisions that point out that the trier of fact is not required to believe unrebutted expert testimony, but may believe all, part or none of such unrebutted expert evidence." *Bancroft* v. *Commissioner of Motor Vehicles*, 48 Conn. App. 391, 405, 710 A.2d 807, cert. denied, 245 Conn. 917, 717 A.2d 234 (1998). Numerous decisions in this court have upheld decisions in which the trier of fact has opted to reject the unrebutted testimony of an expert witness under appropriate circumstances. See, e.g., *State* v. *Blades*, 225 Conn. 609, 627, 626 A.2d 273 (1993) (rejecting claim that court was required to accept defense of extreme emotional disturbance in criminal case where defendant had proffered expert testimony of psychiatrist and state did not present own evidence to rebut defense); *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 538, 552, 525 A.2d 940 (1987) (finding sub-

stantial evidence to support agency's denial of plaintiff's permit to build on regulated property where plaintiff proffered testimony of four experts and defendant offered no expert testimony in rebuttal). Accordingly, we conclude that the trial court properly concluded that the commissioner was not required to accept the testimony of the plaintiffs' expert.

## VI

The plaintiffs' final claim is that the trial court improperly concluded that substantial evidence existed in the record to support the commissioner's decision. Specifically, the plaintiffs assert that substantial evidence did not exist to support the finding that certifications had been altered for many of the medicaid patients because the department did not: (1) offer the testimony of any physicians to confirm that their orders or signatures had been altered; and (2) present any testimony relating to the handwriting used in the exhibits to demonstrate the alteration of certifications. The plaintiffs essentially assert that, because the department did not present what the plaintiffs believe would have been the most persuasive evidence on a particular point—testimony from the physicians who ordered the oxygen services— the evidence that was presented to show that various documentation was altered was insufficient. The department responds that, although it did not present the testimony of a physician or a handwriting expert to address the alteration of certifications, it had presented voluminous evidence showing that the plaintiffs falsified medicaid claims.

The trial court in the present case concluded that the findings and conclusion of the commissioner were supported by substantial evidence in the record, stating "[t]he return of record is ninety-nine pages long and includes: (1) the testimony of D'Anzi regarding the scope of the audit . . . (2) acknowledgment by . . .

Bouchard of the basic findings of the audit . . . (3) the testimony of [Sandra Burkhardt, a former Goldstar employee] on May 10, 2002 . . . demonstrating that Bouchard instructed his staff to complete the [certifications]; (4) the testimony of [Susan Simms, a department employee], and nursing supervisor [Christine] Macrino supporting the findings that individual patients had their [certifications] altered . . . (5) numerous completed [certification] forms that show discrepancies when compared with the [physicians'] orders."

We begin our analysis by setting forth the appropriate standard of review. "[J]udicial review of the commissioner's action is governed by the [UAPA] . . . and the scope of that review is very restricted." (Internal quotation marks omitted.) *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, 285 Conn. 794, 803, 942 A.2d 305 (2008). "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *Dolgner* v. *Alander*, 237 Conn. 272, 280, 676 A.2d 865 (1996).

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. [See] General Statutes § 4-183 (j) (5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limita-

tion on the power of the courts to overturn a decision of an administrative agency . . . ." (Citations omitted; internal quotation marks omitted.) *Dolgner* v. *Alander*, supra, 237 Conn. 281. "It is fundamental that a plaintiff has the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion . . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343–44, 757 A.2d 561 (2000).

An appellate court's duty in assessing whether substantial evidence has been presented is to determine whether "the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred" from the evidence presented. (Internal quotation marks omitted.) *O'Connor* v. *Waterbury*, 286 Conn. 732, 741, 945 A.2d 936 (2008). It is not the function of an appellate court to insist that one particular type of evidence be presented before finding substantial evidence to be present. Indeed, we have stated previously that "[t]here is no distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Citations omitted; internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, supra, 254 Conn. 345 n.14. The plaintiffs have cited no authority, and we have found none, to support their contention that the department must offer the most probative possible evidence on a particular fact or issue in order to satisfy the substantial evidence test.

This court's decision in *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 525, is instructive. The plaintiff property owner in *Huck* had applied for a permit to construct a single-family residence

within a regulated area in Greenwich. Id., 526. The plaintiff offered the testimony of four experts in support of her application, and the defendant, the inland wetlands and watercourses agency of the town of Greenwich, offered no expert testimony in rebuttal. Id., 538. The defendant did not issue the permit, and the plaintiff appealed to the trial court. The trial court sustained the plaintiff's appeal from the denial of the permit, finding that the record contained no reasons that were supported by substantial evidence. Id., 536–38. The defendant appealed, and this court affirmed the defendant's decision, faulting the trial court for substituting its own judgment and discretion. Id., 538, 554. This court reviewed the record and found that the defendant had provided a number of reasons for denying the permit, even though the plaintiff had not presented a particular type of evidence in support of its position. Id., 542–50. Similarly, in the present case, the fact that the department did not proffer a particular type of evidence regarding the alteration of certifications, such as testimony from physicians, does not preclude a finding that substantial evidence was present in the record to support the commissioner's findings and conclusions.

Nevertheless, we still must determine whether the trial court properly concluded that the decision of the commissioner is reasonably supported by the evidence. The record in the present case is voluminous, consisting of: more than 11,000 pages of transcript from a hearing that lasted forty-seven days over a period of eight months; hundreds of exhibits, many of which were presented by the department; and extensive witness testimony, including that of two former Goldstar employees who provided firsthand accounts of the improprieties that occurred at Goldstar. The testimony of Burkhardt and Pamela McGee demonstrated that Bouchard himself played a significant role in the fraudulent alteration

of various documentation.[16] Burkhardt and McGee testified that Bouchard himself spearheaded Goldstar's scheme to defraud the department, and personally ordered and instructed his employees to follow his lead. The employees' testimony supported findings that Bouchard: personally had altered certifications; had ordered Goldstar employees to alter certifications; had instructed Goldstar employees how to alter certifications; had been present while a Goldstar employee altered certifications; and had chastised a Goldstar employee who refused to alter additional certifications. Other testimony also revealed that other Goldstar executives were complicit in the impropriety as well. James Freeburn, a vice president of Goldstar, had testified that he did not terminate the employment of an employee whom he had witnessed altering sections of certifications in violation of medicaid regulations.

We agree with the commissioner that the record in the present case reveals overwhelming evidence that the plaintiffs committed medicaid fraud. Accordingly, we conclude that the trial court properly determined that the evidence in the administrative record was sufficient to support the commissioner's findings and decision.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] McGee was a respiratory therapist employed by Goldstar from November, 1996, to March, 1998. Sandra Burkhardt was employed as a billing specialist at Goldstar from approximately May, 1995, through April, 1997.