## F.M.* *v.* COMMISSIONER OF CHILDREN AND FAMILIES
## (AC 34861)

Lavine, Beach and Bear, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the family members in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest and upon order of the Appellate Court.

Argued March 4—officially released June 25, 2013

*F.M.*, self-represented, with whom, on the brief, was *David E. Schneider, Jr.*, for the appellant (plaintiff).

*Susan T. Pearlman*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (defendant).

*Opinion*

LAVINE, J. The plaintiff father, who is self-represented in this court,[1] appeals from the judgment of the trial court dismissing his administrative appeal from

---

[1] The plaintiff was represented by counsel during the administrative proceedings in the department of children and families and on appeal to the Superior Court.

the decision of a department of children and families (department)[2] hearing officer who found that the department had substantiated allegations of emotional and physical neglect against him and upheld the department's recommendation that the plaintiff's name be placed on its child abuse registry (central registry). See General Statutes §§ 17a-101g (b)[3] and 17a-

[2] The plaintiff brought this action against the defendant, Joette Katz, in her official capacity as commissioner of children and families. In this opinion, we refer to the department as the defendant.

[3] General Statutes § 17a-101g provides in relevant part: "(a) Upon receiving a report of child abuse or neglect, as provided in sections 17a-101a to 17a-101c, inclusive, or section 17a-103, in which the alleged perpetrator is (1) a person responsible for such child's health, welfare or care . . . the Commissioner of Children and Families, or the commissioner's designee, shall cause the report to be classified and evaluated immediately. If the report contains sufficient information to warrant an investigation, the commissioner shall make the commissioner's best efforts to commence an investigation of a report concerning an imminent risk of physical harm to a child or other emergency within two hours of receipt of the report and shall commence an investigation of all other reports within seventy-two hours of receipt of the report. . . . The department shall complete any such investigation not later than forty-five calendar days after the date of receipt of the report. . . .

"(b) The investigation shall include a home visit at which the child and any siblings are observed, if appropriate, a determination of the nature, extent and cause or causes of the reported abuse or neglect, a determination of the person or persons suspected to be responsible for such abuse or neglect, the name, age and condition of other children residing in the same household and an evaluation of the parents and the home. The report of such investigation shall be in writing. . . . After an investigation into a report of abuse or neglect has been completed, the commissioner shall determine, based upon a standard of reasonable cause, whether a child has been abused or neglected, as defined in section 46b-120. If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) There is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k. . . ."

General Statutes (Rev. to 2009) § 46b-120, as amended by Public Acts, Spec. Sess., September, 2009, No. 09-7, § 69, provides in relevant part: "The terms used in this chapter shall, in its interpretation and in the interpretation of other statutes, be defined as follows . . .

"(3) 'Abused' means that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, (B) has injuries

101k.[4] On appeal to this court, the plaintiff claims that the trial court improperly dismissed his administrative appeal by concluding (1) that there was substantial evidence in the record to substantiate (a) the allegations of emotional and physical neglect against him and (b) to recommend placing his name on the central registry, and (2) that the department's substantiation of the allegations of physical and emotional neglect against him was not unreasonable, arbitrary, illegal or an abuse of discretion. We affirm the judgment of the trial court.

The record discloses that on May 21, 2010, the department received an anonymous report alleging emotional and physical neglect against the plaintiff with respect to his two minor daughters. The department initiated an investigation that was assigned to Heather Howard, an investigations social worker. On June 29, 2010, on the basis of Howard's investigation, the department substantiated the allegations of emotional and physical neglect, concluding that the plaintiff had exposed his

that are at variance with the history given of them, or (C) is in a condition that is the result of maltreatment, including, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment . . .

"(8) A child or youth may be found 'neglected' who (A) has been abandoned, (B) is being denied proper care and attention, physically, educationally, emotionally or morally, (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused . . . ."

[4] General Statutes § 17a-101k (a) provides in relevant part: "The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. . . ."

daughters to family violence that had an adverse emotional impact on them. Consequently, the department recommended that the plaintiff's name be placed on its central registry.[5]

The plaintiff requested that the department review the substantiated allegations and the recommendation that his name be placed on the central registry. On or about October 7, 2010, the department notified the plaintiff of the results of its review pursuant to an investigation protocol. The review substantiated the allegations of emotional and physical neglect as well as the recommendation that the plaintiff's name be placed on the central registry. Thereafter, the plaintiff requested an administrative hearing to appeal from the substantiation.

By letter dated October 28, 2010, the department informed the plaintiff of the time and place of the substantiation hearing and stated that the hearing would be held pursuant to General Statutes § 17a-101k and § 17a-101k (1) through (16) of the Regulations of Connecticut State Agencies. The letter also stated: "Before the hearing, the [d]epartment will provide you and the [h]earing [o]fficer a copy of the *investigation protocol which will be admitted into the record.* The [d]epartment's witnesses may include *Heather Howard* and/or [investigation supervisor] Walter Belsito."[6] (Emphasis added.)

A substantiation and central registry hearing was held on January 4 and February 8, 2011, before M. James Malcolm, Jr., a department hearing officer. In a final decision issued on April 6, 2011, the hearing officer

---

[5] At the time the allegations of emotional and physical neglect were alleged against the plaintiff, he was a fifty-three year old professor. He came to the United States from Iran and earned a doctor of philosophy degree.

[6] The October 28, 2010 letter from the department to the plaintiff also stated: "Please read the enclosed 'Fact Sheet' and [department] Policy."

found that the plaintiff is the father of two daughters born in 1995 and 2003, respectively. The plaintiff and his wife, who is the mother of his daughters, had a contentious relationship in which the plaintiff abused her, sometimes in the presence of their daughters.[7] The plaintiff called his wife derogatory, sometimes vulgar, names. In May, 2010, the plaintiff referred to his wife as "stupid" in the presence of his daughters. When the older daughter later told her mother what the plaintiff had said, the plaintiff became angry with his daughter, shoved her and shook her for having repeated the name. The older daughter then hid under the kitchen table to get away from the plaintiff.

The hearing officer also found that the plaintiff had called his older daughter demeaning names, which made her feel "horrible." It "bothered" her to think of the names the plaintiff called her and her mother. Moreover, the plaintiff blamed his older daughter for the poor relationship that he has with his wife, which caused the daughter to feel that she was to blame for the plaintiff's assaults on her mother. The plaintiff regularly hit, grabbed, shoved, and pushed his older daughter, who often worried, which prevented her from concentrating at school. She lived in fear that the plaintiff would do something bad to her mother.

The hearing officer found that the older daughter thought that living with the plaintiff was like "walking on eggshells." On May 27, 2010, the mother applied for a restraining order against the plaintiff and moved out of the family home with her daughters. Prior to moving out of the family home, the older daughter was afraid that she might say or do something wrong in the plaintiff's presence. In his presence, she was nervous and unable to eat; she also bit her nails. After moving away

---

[7] In his complaint, the plaintiff alleged that he and his wife are now divorced.

from the plaintiff, the older daughter's eating behavior improved and she stopped biting her nails.

As to the younger daughter, the hearing officer found that she had disclosed that the plaintiff hit her mother many times and confirmed that he used bad words when talking to her mother. At school, the younger daughter "presented" to her teachers as being anxious and withdrawn. According to school authorities, the younger daughter wrote letters to "everyone she could think of" as a way of distracting herself from family issues. After moving out of the family home, the younger daughter stated that she liked staying in a hotel and did not want to see the plaintiff.

The hearing officer found that the plaintiff's daughters had reported that they did not feel safe with him because they regularly saw him grab, shove, and hit their mother. During one incident that took place in the family car, the daughters witnessed the plaintiff "backhand" their mother because she had changed the radio station without asking the plaintiff's permission. The daughters stayed quiet to avoid further upsetting the plaintiff.

The hearing officer found that on June 1, 2010, the plaintiff went to his older daughter's school to visit her. When the daughter was told by school authorities that her father was in the office waiting to see her, she became nervous and cried. She did not want to see him and asked her guidance counselor to be present while she visited with the plaintiff. At the conclusion of the visit, the daughter stated to her guidance counselor: "he doesn't really care that much"; "I don't trust him"; and "he's putting on an act, I don't want to see him, he doesn't care, he's just putting on a show." The older daughter stated constantly that she did not want any further contact with the plaintiff.

The hearing officer found that the plaintiff had admitted to having pushed and shoved his wife in the presence of his daughters. The plaintiff stated, "I know it isn't justified. . . . I shouldn't have done it." When asked about the shoving incident with his older daughter, the plaintiff stated, "it might have happened," minimizing the impact his behavior had on his daughter.

During the hearing, the plaintiff cross-examined Howard and presented testimony and letters from friends and professional colleagues, who stated that they had never witnessed any abusive or negligent behavior on the part of the plaintiff. The hearing officer found, however, that none of the plaintiff's witnesses resided in his home and had not observed the plaintiff's actions when he was alone with his family.

The hearing officer found that the department had substantiated the allegations of emotional neglect by a fair preponderance of the evidence by demonstrating that the plaintiff is a person responsible for his daughters' health, welfare or care and that he denied his daughters proper care and attention emotionally or failed to respond to their affective needs, which had an adverse impact on them or seriously interfered with their positive emotional development. The hearing officer further found that it was not necessary to find an adverse impact if the plaintiff's alleged behavior was so egregious that it demonstrated a serious disregard for his daughters' welfare. See Dept. of Children and Families Policy Manual § 34-2-7.[8]

[8] Section 34-2-7 of the department's policy manual provides in relevant part: "Emotional Maltreatment-Abuse . . . are: act(s), statement(s), or threats, which has had, or is likely to have an adverse impact on the child and/or interferes with a child's positive emotional development. **Note:** Whether or not the adverse impact has to be evident is a function of the child's age, cognitive abilities, verbal ability and developmental level. Adverse impact is not required if the action/inaction is a single incident which demonstrates a serious disregard for the child's welfare.

"The adverse impact may result from a single event and/or from a consistent pattern of behavior and may be currently observed, and/or predicted, as supported by evidenced based practice.

The hearing officer found that a preponderance of the evidence demonstrated that the plaintiff's actions toward his daughters had an adverse impact on their emotional development and well-being. The older daughter feared the plaintiff and blamed herself for the violence he perpetrated on his family. The younger daughter did not want to see him after she moved out of the family home. At school, the younger daughter presented as anxious and withdrawn and wrote letters to everyone she could think of to distract her from the issues in her family.

The hearing officer also found that the department had met its burden to substantiate the allegations of physical neglect against the plaintiff. That is, he permitted his daughters to live under conditions, circumstances or associations that were injurious to their well-being by exposing them to family violence, which had an adverse physical impact on them.[9] He had exposed his daughters to family violence, which demonstrated a serious disregard for their welfare. In support of his substantiation finding, the hearing officer cited evidence of the defendant's driving with his daughters in

"Evidence of emotional maltreatment-abuse includes, but is not limited to, the following: rejecting; degrading; isolating and/or victimizing a child by means of cruel, unusual, or excessive methods of discipline; exposing the child to brutal or intimidating acts or statements.

"Indicators of Adverse Impact of emotional maltreatment-abuse may include, but are not limited to, the following: depression, withdrawal, low self-esteem, anxiety, fear, aggression/passivity, emotional instability, sleep disturbances, somatic complaints with no medical basis, inappropriate behavior for age or development, suicidal ideations or attempts, extreme dependence, academic regression, and/or trust issues."

[9] The hearing officer identified the factors that the department had to demonstrate to substantiate the allegations of physical neglect: the plaintiff (1) is a person responsible for the children's health, welfare or care; or is a person given access to the children by a person responsible, or is a person entrusted with the children's care, (2) denied the children proper care and attention and permitted them to live under conditions, circumstances or associations injurious to their well-being, and (3) the failure resulted in an adverse physical impact on the children unless the act was a single incident that demonstrated a serious disregard for their welfare.

the car and "backhanding" his wife. The hearing officer found that the plaintiff could have been involved in an accident while distracted and that he could not have ensured the safety of his daughters. In addition, the plaintiff grabbed and shoved his older daughter in May, 2010, because the daughter had repeated to her mother the horrible name the plaintiff had called her mother. The plaintiff failed to take appropriate care of his daughters, as he constantly verbally or physically assaulted them, making them live in fear of him. Although the plaintiff's witnesses testified that he was a good father, the hearing officer did not credit their testimony because none of them had observed the incidents at issue. The hearing officer concluded that the department had substantiated the allegation of physical neglect against the plaintiff.

Section 34-2-8[10] of the department's policy manual requires the department to make a separate finding as

---

[10] Section 34-2-8 of the department's policy manual provides in relevant part: "Public Act 05-207 directs [the department], following a substantiated allegation of neglect or abuse, to identify a perpetrator, if possible, and make a separate determination that the person should or should not be on the Central Registry. . . . [I]n order to place a person on the Central Registry [the department] must make a finding that child abuse or neglect has occurred, there is an identifiable person responsible for abuse or neglect . . . the person poses a risk to the health, safety or well-being of children, and the person should be recommended for placement on the Central Registry . . . .

"It is the obligation of the Department to justify the inclusion of a 'person responsible' on the Central Registry. Department staff shall be expected in all circumstances to demonstrate a determination based upon professional judgment.

"The identified perpetrator shall be recommended by investigations staff for placement on the [Central] Registry, and shall be confirmed by the Hearings Officer for placement on the [Central] Registry when . . . the perpetrator of physical or emotional abuse is a person entrusted with the care of a child . . . .

"In all other cases in which the department substantiates abuse or neglect by an identified perpetrator, the investigator and the [Hearing] Officer in cases which proceed to administrative hearing, shall review the case for a determination of whether the perpetrator poses a risk to the health, safety and well-being of children and should be recommended for placement on

to whether a person responsible for child abuse or neglect poses a risk to children, and if so, whether the person's name should be placed on the central registry. In making that determination, the department must consider the responsible person's intent, the severity of the impact on the children, the chronicity of the neglectful conduct, and whether domestic violence was involved. See footnote 10 of this opinion. The hearing officer considered the evidence and found substantial evidence to support the department's recommendation that the plaintiff's name be placed on the central registry.

The intent factor focuses on whether the plaintiff had sufficient knowledge and resources, the ability to utilize them, and an understanding of the implications of failing to provide appropriate care for his children, but that he made a conscious decision not to do so. The hearing officer found that the plaintiff had sufficient knowledge and resources, the ability to utilize them and understood the implications of failing to provide appropriate care for his daughters: he had a history of exposing his family to violence; he engaged in therapy to address his anger issues and aggressive behaviors, but he continued to minimize the impact his behavior had on his daughters, and their fear of him, and their not wanting to see him after they moved out of the family home. The hearing officer found that the plaintiff should have known that continually exposing his daughters to violence was not appropriate.

As to the severity of the plaintiff's conduct, the hearing officer found substantial evidence that his conduct

the Central Registry. The investigator, and the [Hearing] Officer, shall look at factors including the intent of the perpetrator, the severity of the impact and the chronicity of the perpetrator's conduct in making that determination." See http:/www.ct.gov/dcf/cwp/view.asp?a=2639&Q=432750 last visited June 12, 2013; see also Regs., Conn. State Agencies § 17a-101k-3.

The breadth of the applicability of § 34-2-8 is not an issue raised in this appeal. We therefore do not consider it.

had a serious adverse impact on his daughters and demonstrated a serious disregard for their welfare: his daughters complained about his repeated verbal and physical abuse; the older daughter was nervous and did not eat well until she moved out of the family home; and neither child wanted to see him.

With respect to chronicity, the hearing officer found a pattern of neglect because the plaintiff regularly engaged his family in domestic violence and permitted the children to live under conditions and circumstances injurious to their well-being. He had physically and verbally abused his wife and daughters over many years: he had called his older daughter "stupid" and "retarded" many times, which made her feel "horrible"; the older daughter heard the plaintiff call her mother names, which were demeaning and sometimes vulgar; the older daughter was afraid of the plaintiff and was "bothered" when she thought about the names the plaintiff called her and her mother; and the plaintiff hit, grabbed, shoved, and pushed his older daughter regularly. The plaintiff's younger daughter confirmed that he hit her mother many times and used bad words when talking to her mother. Both of the plaintiff's daughters were present when he "backhanded" their mother for changing the station on the car radio without asking his permission.

When domestic violence is a significant contributing factor to the substantiation of emotional and physical neglect, the department must consider whether the perpetrator refused to acknowledge his violent conduct, refused to take responsibility for it, and whether a viable plan was provided to address the domestic violence. See footnote 10 of this opinion. The hearing officer found that domestic violence was a serious contributing factor to his findings of emotional and physical neglect. Although the plaintiff had engaged in therapy to address his anger issues and aggressive behavior, he continued

to blame his wife for his behavior and minimized the impact his behavior had on his daughters. Those facts, the hearing officer found, supported the department's determination that the plaintiff poses a risk to the health, safety or well-being of children and affirmed the department's recommendation to place the plaintiff's name on the central registry.[11]

On April 25, 2011, the plaintiff filed a petition for reconsideration of the hearing officer's final decision, asking that the substantiation of allegations against him be reversed, as well as the recommendation that his name be placed on the central registry. The plaintiff claimed that the department failed to meet its burden and strongly denied that he ever physically or emotionally neglected his daughters. He represented that the only department witness against him was Howard and the only exhibit introduced by the department was the investigation protocol. By contrast, he and four witnesses who knew him testified on his behalf. The plaintiff also put into evidence supportive letters from people who knew him. He argued that his evidence was inconsistent with the allegations made by the department. Moreover, the hearing officer chose not to credit the testimony and evidence he offered because none of those individuals had observed the incidents at issue, but neither had Howard. He challenged the hearing officer's finding that he had engaged in therapy to address his anger and aggressive behavior, which contradicted the testimony of Carey A. O'Neill, a clinical psychologist.[12] The plaintiff also disagreed with the hearing officer's finding that he had constantly verbally and physically assaulted both of his daughters. The

---

[11] The hearing officer granted the plaintiff the right to appeal from the decision pursuant to General Statutes § 4-183.

[12] According to the plaintiff, O'Neill testified that the plaintiff engaged in therapy "secondary to distress about his relationship with his wife." The plaintiff reported to O'Neill that he was having difficulty dealing with his wife's increasingly angry and irrational behavior.

plaintiff argued that there was no evidence that the younger daughter liked to stay in hotels.

Finally the plaintiff claimed that he was denied due process of law because the only evidence presented against him was hearsay, as well as Howard's unwarranted consideration of the fact that the plaintiff's family came from Iran and a belief that domestic violence is prevalent in Iranian society. He argued that there was no need for Howard "to gain background information on domestic violence issues and behaviors in Iranian culture." The plaintiff also stated that the hearing officer's finding that he poses a risk to the health, safety, and well-being of children was "absurd." According to him, he is an educator with an excellent reputation who had never been the subject of a department investigation. He has no criminal history and has never been arrested. He placed significance on the fact that the allegations of child abuse came to light contemporaneously with his wife's decision to divorce him.

Pursuant to General Statutes § 4-181a,[13] the hearing officer found that the plaintiff's petition alleged errors of fact and law and other good cause for reconsideration. The hearing officer first addressed the claim that the testimony and reference letters the plaintiff placed into evidence should have been credited and weighed in his favor because none of the witnesses ever observed the plaintiff being abusive toward his family and that the plaintiff claimed that the incidents never took place. The hearing officer found that the evidence did not support the plaintiff's position.

---

[13] General Statutes § 4-181a (a) provides in relevant part: "(1) Unless otherwise provided by law, a party in a contested case may, within fifteen days . . . of the final decision, file with the agency a petition for reconsideration of the decision on the ground that: (A) An error of fact or law should be corrected; (B) new evidence has been discovered which materially affects the merits of the case and which for good reasons was not presented in the agency proceeding; or (C) other good cause for reconsideration has been shown. . . ."

The hearing officer examined O'Neill's testimony and found that she observed the plaintiff only during therapy. She had never observed the plaintiff interact with his wife and daughters. O'Neill had spoken with three people who have regular contact with the plaintiff at his place of employment, but she acknowledged that people can be quite different at home. The hearing officer found that Howard had interviewed the plaintiff's wife and daughters individually, and once interviewed the two girls together. They provided Howard with detailed descriptions of how the plaintiff interacted with them in the privacy of their home. Their descriptions were consistent.

Although the plaintiff claimed that he was engaged in therapy with O'Neill, not because of anger issues, but because he was distressed about his relationship with his wife, the hearing officer found facts to the contrary. The record reveals that the plaintiff met with Howard and Gail Manna, a domestic violence liaison to the department, and disclosed to them that he was seeing a therapist because "I want to be at a point [where] I don't get angry or react to [my wife] in any way. I wanted to get to a point that I don't get angry like I used to."

The hearing officer disagreed with the plaintiff's contention that the final decision stated that the plaintiff had assaulted his younger daughter. The final decision states that both daughters complained about the plaintiff's verbal and physical abuse, especially as it related to them as a family, and that the abuse had a negative emotional impact on both of them. The hearing officer also disagreed with the plaintiff's representation that the hearing officer found that the younger daughter liked to stay in hotels. The final decision states that when the younger daughter moved out of the family home, she preferred to stay in a hotel rather than to return to the home where the plaintiff was living. The

younger daughter did not want to see the plaintiff because he exposed his family to domestic violence.

The plaintiff claimed that Howard placed undue consideration on the fact that he and his family came from Iran. The hearing officer stated that he gave no consideration to Howard's findings about domestic violence and Iranian culture. The final decision makes no reference to domestic violence in the Iranian culture.

The plaintiff claimed that the hearing officer's finding that he poses a risk to the health, safety or well-being of children was "absurd" and that the only reason the department became involved with his family was his wife's desire to divorce him. The hearing officer found that the record supports a finding that the plaintiff poses a risk to the health, safety and well-being of children, as he manifested the elements of intent, severity, and chronicity to expose his daughters to domestic violence. Domestic violence was a significant factor contributing to the department's substantiating the allegations of child abuse and neglect against the plaintiff.

The hearing officer concluded that the plaintiff had failed to establish any errors of fact or law to warrant reconsideration and that he had failed to present any new evidence that materially affected the merits of the final decision. The hearing officer therefore denied the petition for reconsideration. Thereafter, the plaintiff commenced the present action against the commissioner of children and families in her official capacity in July, 2011.

In his complaint, the plaintiff denied that he ever physically or emotionally neglected his children. He alleged that the evidence produced at the hearing "consisted solely of hearsay statements as recounted by" Howard, and further alleged that the hearing officer

denied him due process of law by upholding the substantiated allegations of neglect, specifically, that the hearing officer did not give due consideration to Howard's inappropriate reliance on his Iranian heritage and that domestic violence is believed to be prevalent in Iranian society. Finally, the plaintiff alleged that the department's decision to place his name on the central registry was not based on substantial evidence and therefore was unreasonable, arbitrary, illegal, and an abuse of discretion.

The court dismissed the plaintiff's appeal in a memorandum of decision rendered on May 23, 2012. The court recited the findings made and the conclusions drawn by the hearing officer, as well as the law governing allegations of emotional and physical neglect and the department's burden to substantiate such allegations. With regard to the plaintiff's hearsay claim, the court noted in an extensive analysis that hearsay testimony generally is admissible in administrative hearings as long as it is sufficiently trustworthy. See *Family Garage, Inc.* v. *Commissioner of Motor Vehicles*, 130 Conn. App. 353, 360, 23 A.3d 752, cert. denied, 302 Conn. 931, 28 A.3d 345 (2011). The court identified the factors pertinent to the trustworthiness of the evidence presented at an administrative hearing, namely, whether (1) the investigator had an interest in the outcome of the case, (2) the investigation protocol was the product of personal consultation and was conducted in accordance with department procedures, and (3) there are inconsistencies on the face of the report. See *Carlson* v. *Kozlowski*, 172 Conn. 263, 267–68, 374 A.2d 207 (1977).

The court concluded that the hearing officer's consideration of hearsay evidence was not so prejudicial that the plaintiff's constitutional rights to due process were violated. In accordance with department regulations, the hearing officer properly admitted hearsay attributed to the plaintiff's daughters in lieu of having them testify

at the hearing.[14] Moreover, hearsay testimony was not the only evidence probative of the plaintiff's culpability presented at the hearing. The plaintiff was confronted directly with several statements attributed to him in the investigation protocol that suggested an ongoing pattern of physical and verbal abuse. Although the plaintiff claimed to have been misquoted, he admitted to having pushed his older daughter into a chair when he became frustrated with her; to repeatedly pushing his wife, although he claimed it was in a playful manner; and to having called his wife names when they argued. The plaintiff also admitted that on at least one occasion one of his daughters witnessed an argument between her parents. He also admitted that he called his wife names in front of his daughters when his wife was not present. The court concluded that, in light of the plaintiff's admissions, the hearing officer was free to consider the challenged hearsay evidence when weighing the credibility of the plaintiff's conflicting testimony.

The court recognized its limited scope of review and that it was not permitted to retry the case or to substitute its judgment for that of the hearing officer. See Uniform Administrative Procedure Act, General Statutes § 4-166 et seq.; *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 800, 955 A.2d 15 (2008). The court concluded that the record supports the hearing officer's final decision and that it was not in a position to reevaluate the facts on the basis of the hearing officer's credibility determinations.

The plaintiff also claimed that the department and Howard abused their discretion and acted unreasonably, arbitrarily and illegally in considering his ancestry

---

[14] See Regs., Conn. State Agencies § 17a-101k-8 (h), which provides: "The abused or neglected child who is the subject of the substantiation shall not testify in an administrative hearing while that child is still a minor."

and national origin when they substantiated the allegations of emotional and physical neglect. In addressing the claim, the court recognized General Statutes (Rev. to 2009) § 46a-71 (a)[15] and that Connecticut has long prohibited discrimination on the basis of ethnicity. The court found that the investigation protocol compiled by Howard contains substantial excerpts from a work by Azad Moradian entitled "Domestic Violence Against Single and Married Women in Iranian Society" (Moradian article).[16] At the substantiation hearing, Howard

---

[15] General Statutes (Rev. to 2009) § 46a-71 (a) provides that the "services of every state agency shall be performed without discrimination based upon race, color, religious creed, sex, marital status, age, national origin, ancestry, mental retardation, mental disability, learning disability or physical disability, including, but not limited to, blindness."

[16] The investigation protocol states the following, in relevant part: "Given the complexities of this investigation, and the ways in which domestic violence was evidenced through both typical Western behaviors as well as influenced by this family's Eastern culture, it was necessary for this worker to gain background information on domestic violence issues and behaviors in Iranian culture. The information this worker drew from included: Domestic Violence against Single and Married Women in Iranian Society, by Azad Moradian, The Chicago School of Professional Psychology, Los Angeles, California August 2009 [w]hich reports:

" 'The National Coalition Against Domestic Violence begins their fact sheets with the following words: 'the willful intimidation, physical assault, battery, sexual assault, and/or other abusive behavior perpetrated by an intimate partner against another. It is an epidemic affecting individuals in every community, regardless of age, economic status, race, religion, nationality or education background.

" 'Violence against women is often accompanied by emotionally abusive and controlling behavior, and thus is part of a systematic pattern of dominance and control. Domestic violence results in physical injury, psychological trauma, and sometimes death. The consequences of domestic violence can cross generations and truly last a lifetime.'

"Furthermore this article provided this worker with the following culturally [sensitive] information on domestic violence within Iranian culture:

" 'In Iranian society domestic violence takes on an entirely different shape. Women are not only subject to harsh treatments by an authoritative state, which rules on every [aspect] of their public lives, but it also provides the arena and encourages the control of their private lives. The government does so by promoting fundamentalist ideas of women as properties of men. It does so by setting up an unequal legal system and not punishing assault even when it has resulted in severe injury or at times even death. The

explained her reasons for including excerpts from the Moradian article in the investigation protocol. She wanted to gain context for a statement made by the plaintiff's wife concerning her cultural background and her corresponding reluctance to report the plaintiff's abuse. The investigation protocol prefaces a quotation from the Moradian article by noting the complex cultural issues involved in the case and Howard's lack of familiarity with Iranian culture. The court's review of the record disclosed that the hearing officer prohibited the department from introducing evidence of the plaintiff's ancestry and national origin. During cross-examination, however, the *plaintiff* addressed his cultural heritage, and questioned Howard about the Moradian article, and her use of it. The court found that Howard repeatedly disclaimed the proposition, posed by the plaintiff in his questioning of her, that Iranian men are more likely to commit domestic violence.

The court concluded that the plaintiff had failed to demonstrate actual bias on the part of Howard or the hearing officer. See *Elf* v. *Dept. of Public Health*, 66 Conn. App. 410, 425, 784 A.2d 979 (2001) (plaintiff must

conversation of domestic violence then cannot be simply domestic but begins to take the shape of a systematic violence, fueled by tradition, ignited by religion, encouraged by the dominant authoritarian state, and empowered by poverty and illiteracy.

" 'Up until recently, there was no official statistical data on how many women suffered from domestic violence in Iran and what shape or form it was in. The common law dictated that what happens in the house has to stay in the house. A man's household affairs very much belongs to him and others can not meddle in his private issues, especially regarding how he treats his wife and children.

" 'Women and girls face insurmountable obstacle[s] in getting a divorce, forced to stay even if she was in an abusive marriage and most likely lose custody of her children above age 7 to her husband and the children's paternal grandfather. In contrast men can marry up to 4 girls and [women] and can divorce them at will. The rules of evidence make it extremely difficult for women to prove their case in [court. Should] the wife [decide] to file a case of domestic violence her testimony is only worth half of a man's testimony.' "

demonstrate actual, not mere potential, bias). The hearing officer's final decision makes no reference to either the plaintiff's national origin or the Moradian article. In his ruling on the petition for reconsideration, the hearing officer stated that he "gave no consideration to [Howard's] findings about domestic violence and [Iranian] culture." The court found that although the investigation protocol includes "a potentially discriminatory observation" regarding domestic violence in Iranian culture, nothing in the record suggests that Howard or the department relied upon that evidence to substantiate the allegations of emotional and physical neglect against the plaintiff. In fact, the court found that the hearing officer made an effort to avoid considering information concerning evidence of domestic violence in the Iranian culture.

In dismissing the plaintiff's administrative appeal, the court found, on the basis of the evidence presented at the substantiation hearing and the findings of the hearing officer, that the department did not act unreasonably, arbitrarily or illegally in upholding the substantiation of the allegations of emotional and physical abuse against the plaintiff and by recommending that his name be placed on the central registry. The court also found that in doing so the department did not abuse its discretion. The plaintiff then appealed to this court from the judgment of dismissal.

Before we address the plaintiff's claims, we set forth the applicable standard of review and note the narrow function of this court in reviewing an appeal such as this. It is important to note that judicial review of the department's decision is governed by the Uniform Administrative Procedure Act and that the scope of review under General Statutes § 4-183 "is very restricted." (Internal quotation marks omitted.) *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, 285 Conn. 794, 803, 942 A.2d 305 (2008). "[R]eview of an

administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 833.

"The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . . It is fundamental that a plaintiff has the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion . . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained." (Citation omitted; internal quotation marks omitted.) Id., 833–34.[17]

I

The plaintiff claims that the trial court erred when it concluded that there was substantial evidence in the

[17] During oral argument on appeal, the plaintiff questioned why he bore the burden of persuasion in this court. During the substantiation hearing, the burden was on the department—not the plaintiff—to demonstrate substantial evidence in the record to support its decision. After the hearing officer issued his final decision, the fact-finding process was concluded and the burden shifted to the plaintiff. An appeal "is not a transfer of jurisdiction from the administrative body or official to a court and does not require the court on appeal to retry the case de novo for the purpose of determining whether it shall substitute its findings and conclusions for that of the administrative body or official, but is merely a process to determine whether the body or official has acted arbitrarily, or illegally, or has acted so unreasonably as to have abused its or his discretion." *Holley* v. *Sunderland*, 110 Conn. 80, 82, 147 A. 300 (1929).

record to substantiate (1) the allegations of physical and emotional neglect against him and (2) the recommendation to place his name on the central registry. The plaintiff's claims are similar to those in his appeal to the Superior Court. We conclude that the court properly dismissed the plaintiff's appeal.

Section 4-183 (j) provides in relevant part: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ."

## A

To substantiate the allegations of physical neglect against the plaintiff, the department had to demonstrate that he is a person responsible for the health and welfare of his daughters; that he denied his children proper care and attention, permitting them to live under conditions, circumstances or associations injurious to their well-being; and that that failure had an adverse impact on the children. See Dept. of Children & Families Policy Manual § 34-2-7. The plaintiff does not dispute the finding that he is a person responsible for the health and welfare of his daughters. He claims, however, that he was a loving father who tried to provide a nurturing and supportive environment for them.

Again, the plaintiff challenges the hearing officer's reliance on hearsay statements in the investigation protocol. Section 17a-101k-8 (f) of the Regulations of Connecticut State Agencies provides: "The department's

investigative record including protocol, medical records and other materials used to substantiate abuse or neglect or to make the registry finding, and any relevant documents submitted to the department by the individual responsible for use during the internal review shall be admitted as part of the hearing record."

We note initially that "administrative tribunals are not strictly bound by the rules of evidence and that they may consider exhibits which would normally be incompetent in a judicial proceeding, so long as the evidence is reliable and probative." (Internal quotation marks omitted.) *O'Sullivan* v. *DelPonte*, 27 Conn. App. 377, 381–82, 606 A.2d 43 (1992). "Evidence in written form is not, as a matter of law, inadmissible in an administrative hearing unless it substantially prejudices a party. . . . Moreover, hearsay evidence is not prohibited in administrative proceedings by the Uniform Administrative Procedure Act, which permits the introduction of oral or documentary evidence." (Citation omitted.) Id., 382. Hearsay testimony generally is admissible in administrative hearings as long as it is sufficiently trustworthy. *Family Garage, Inc.* v. *Commissioner of Motor Vehicles*, supra, 130 Conn. App. 360.

The court noted the factors to be considered when determining the trustworthiness of hearsay evidence in an administrative hearing. Those factors include any bias or interest on the part of the investigator, the investigator's personal observations, the investigator's adherence to accepted procedures, and inconsistencies on the face of the report. See *Carlson* v. *Kozlowski*, supra, 172 Conn. 267–68.

"If hearsay evidence is insufficiently trustworthy to be considered 'substantial evidence' and it is the only evidence probative of the plaintiff's culpability, its use to support the agency decision would be prejudicial to

the plaintiff, absent a showing . . . that the appellant knew it would be used and failed to ask the commissioner to subpoena the declarants." Id., 267. The record discloses that the department informed the plaintiff that the investigation protocol would be placed into evidence at the hearing and that Howard would testify. The plaintiff also received a copy of the investigation protocol before the substantiation hearing. The plaintiff did not object to the investigation protocol or any information contained therein. He also did not ask that any of the declarants be subpoenaed to testify, nor did he object to Howard's testimony, except as it pertained to his ethnic background. The plaintiff has failed to demonstrate how he has been prejudiced by the hearsay evidence or that it was not trustworthy.

On appeal, the plaintiff has not presented any new arguments or facts and has failed to demonstrate that the investigation protocol was not sufficiently trustworthy for the hearing officer to have relied on it. He also failed to demonstrate as a matter of law that the court erred by dismissing his appeal. On the basis of our review of the investigation protocol and the hearing officer's findings and conclusions, we agree with the court that the plaintiff was not substantially prejudiced by the hearsay evidence. The statements of school personnel alone are in all likelihood sufficient to substantiate the allegations of emotional neglect. The plaintiff has not demonstrated that his children's teachers were biased or that they had an interest in the outcome of the case. Their statements to Howard were based on their personal observations of the plaintiff's daughters. They stated that the plaintiff's younger daughter was at risk for long-term emotional issues and that the older daughter was afraid of the plaintiff. Moreover, Howard interviewed the daughters twice. Their statements concerning their feelings toward the plaintiff were consistent with the observations of school personnel. Also,

the plaintiff has not demonstrated that the method by which Howard conducted her investigation or interviewed people failed to conform with accepted social work or department practices.

The plaintiff also claims that the investigation protocol is unreliable because certain statements that were recounted by Howard were made in the course of a contentious and difficult divorce. He points to evidence that his wife made false allegations in an application for a temporary restraining order. The hearing officer made no finding with regard to the application for a restraining order. The restraining order and the divorce were not relevant to the issues before the hearing officer, who substantiated the allegations of emotional and physical neglect principally on the basis of Howard's interviews with personnel from the daughters' schools and the daughters' statements that they feared the plaintiff and that he was violent toward their mother and his older daughter. This evidence constitutes the substantial evidence found by the hearing officer to substantiate the allegations of physical and emotional abuse.

The plaintiff claims that the hearing officer relied on statements that were taken out of context. The plaintiff denies having assaulted his wife in the presence of his daughters and asserts that the record demonstrates that it actually was his wife who hit him.[18] We have reviewed the investigation protocol and the entire transcript of the substantiation hearing. During his interview with Howard and Manna, the plaintiff admitted, however, to scarring his wife's arms when he grabbed her and dug in his fingernails. The hearing officer found that the plaintiff "admitted pushing and shoving his wife in the presence of [his daughters] and stated, 'I know it isn't

---

[18] The portion of the record on which the plaintiff relies is his testimony that his wife hit him once six years ago.

justified. . . . I shouldn't have done it.' When asked about the shoving incident with [his older daughter, the plaintiff] said, 'it might have happened,' minimizing the physical altercation with [his older daughter.]"[19]

On appeal, the plaintiff is asking this court to retry the facts on the basis of credibility determinations. This we may not do and therefore conclude that the court properly determined that there was substantial evidence in the record supporting the allegations of physical and emotional neglect against the plaintiff.

B

The plaintiff claims that the court erred when it found that there was substantial evidence in the record to support the department's recommendation that his name be placed on the central registry. We disagree.

General Statutes § 17a-106b provides: "(a) The state of Connecticut finds that family violence can result in abuse and neglect of the children living in the household where such violence occurs and that the prevention of child abuse and neglect depends on coordination of domestic violence and child protective services.

"(b) The Commissioner of Children and Families may consider the existence and the impact of family violence in any child abuse investigation and may assist family members in obtaining protection from family violence."

Department regulations require the department to make a separate finding as to whether a person responsible for child abuse or neglect poses a risk to children, and if so, whether that person's name should be placed

___

[19] Moreover, Howard testified that she asked the plaintiff's older daughter if she had ever seen her mother hit her father. The older daughter laughed and stated, "no . . . ." When Howard asked the younger daughter if she had ever seen her mother hit the plaintiff, the younger daughter "presented with a state of shock on her face in her nonverbal language that I would even question her in regard to mother being physical with father."

on the central registry. In making a finding with regard to the central registry, the department must consider the intent of the responsible person, the severity of the impact on the subject children, the chronicity of the neglectful conduct and whether domestic violence or substance abuse is involved. See Regs., Conn. State Agencies § 17a-101k-3. With respect to the intent factor, the department must consider whether the person had sufficient knowledge and resources, the ability to utilize the resources and an understanding of the implications of failing to provide appropriate care but made a conscious decision not to do so. Id.

On appeal here, the plaintiff claims that the department failed to prove the intent factor, as he never intended to neglect or abuse his children. The plaintiff misapprehends the required finding. The issue is not whether the plaintiff intended to *harm* his daughters, but whether he intended to engage in conduct that *constitutes domestic violence.* The hearing officer found that the plaintiff had sufficient knowledge and resources, the ability to use them, and that he understood the implications of failing to provide appropriate care for his daughters. The plaintiff has a history of exposing his family to violence. He engaged in therapy to address his anger issues and aggressive behaviors, but he continues to minimize the impact such behavior has on his daughters. His daughters fear him and, after leaving the family home, no longer want to see him. The hearing officer concluded that the plaintiff should know that continually exposing his daughters to violence is not appropriate for their emotional development and well-being.

Our review of the record reveals substantial evidence to support the hearing officer's findings and conclusions. The plaintiff's wife reported that he began to abuse her when she was pregnant with their older daughter, who was fourteen at the time of the hearing.

The plaintiff is a highly educated professor of sociology who had sufficient knowledge and resources, and the ability to use them. We agree that the plaintiff's engaging in therapy to address his anger issues is commendable, but he continues to deny or minimize the effect his conduct had on his daughters.

## II

The plaintiff's final claim is that the court erred when it concluded that the department did not abuse its discretion or act unreasonably, arbitrarily and illegally by considering his ancestry and national origin when it substantiated the allegations of emotional and physical neglect against him. We disagree.

Although the investigation protocol contains information concerning domestic violence, in general, and in Iran, in particular, the transcript of the substantiation hearing and the hearing officer's final decision make clear that the plaintiff's national origin was not a factor in finding substantial evidence to support the substantiation of emotional and physical neglect.

First, we echo and underscore the court's statement that "Connecticut has long prohibited discrimination on the basis of ethnicity." See General Statutes (Rev. to 2009) § 46a-71 (a) (all agency services, which include those offered by department, are to be performed without discrimination on basis of religious creed, national origin or ancestry).

The plaintiff claims that the hearing officer was influenced by an inappropriate reliance on the fact that his family came from Iran. He acknowledges that the hearing officer sustained his objection when the department offered evidence of his national origin. Iran and Iranian culture were not mentioned again during the department's presentation of evidence. The plaintiff

himself, however, introduced such evidence when he cross-examined Howard about the Moradian article.[20]

Despite his claim on appeal, the plaintiff concedes in his brief that the hearing officer does not mention his ethnicity or national origin in the final decision. When ruling on the plaintiff's motion for reconsideration, the hearing officer stated that he gave no consideration to Howard's findings with regard to domestic violence and Iranian culture. The plaintiff predicates his claim on the fact that the hearing officer credited Howard's testimony over his testimony. Once again, the plaintiff is asking this court to ignore our limited

---

[20] The plaintiff cross-examined Howard, in part, as follows with regard to the Moradian article:

"Q. Is it fair to call it maybe an Internet blog as opposed to a news?

"A. No, it was from the Chicago School of Professional Psychology. It was the most recent article I could find in regard to this culture [and] domestic violence. . . .

"Q. All right. And do you think, as part of your investigation, it's appropriate to include something like that in this investigation?

"A. It was appropriate in this situation given the dynamics and the cultural issues that mother brought up during the investigation, yes.

"Q. Okay, so let me see if I walk through the reasoning here. My client is originally from Iran.

"A. Um-hum.

"Q. And in Iran men commit domestic violence.

"A. Everywhere.

"Q. Okay. And because my client is from Iran, he commits domestic violence.

"A. No, that's not true.

"Q. And so why did you need the article?

"A. The article was in regard to mother reporting that this was—mother was reporting throughout my investigation that this was something that she never brought forward or understood to be an issue because it was sort of accepted in her culture and society. That she was raised in an environment that, again, accepted that. . . .

"Q. Because my client is from Iran, is he more likely to commit domestic violence?

"A. . . . as to more likely, no."

It is noteworthy that the plaintiff did not object to the inclusion of the Moradian article in the substantiation investigation and did not ask the hearing officer to redact it. Ordinarily, a party who fails to object to evidence at trial may not raise a similar claim on appeal.

function and reverse the findings of the hearing officer and the judgment of the trial court on the basis of credibility. Not only does our standard of review preclude us from making credibility determinations, but also the findings of the hearing officer are supported primarily with evidence attributed to the plaintiff's daughters, their mother, and school personnel. Moreover, the plaintiff has conceded that he called his wife names and pushed her. There was substantial evidence in the record that the plaintiff's daughters were afraid of him. His younger daughter was withdrawn and anxious at school. The older daughter was nervous, did not eat well, and bit her nails.[21] Neither daughter wanted to spend time with him.

As to Howard's including the quotation from the Moradian article in the investigation protocol, she testified that she needed to educate herself in order to understand why the mother was hesitant to come forward with allegations of domestic violence despite having lived with it for fifteen years. The information helped her put the mother's statements in an historical and cultural context. To base a decision on uninformed or negative inferences relating to a person's religion, national origin, or ancestry is entirely improper. For a social worker tasked with a difficult investigation to educate herself so as to better understand the cultural context within which people may conduct themselves is entirely appropriate. We therefore conclude that the court properly determined that the department's decision to sustain the allegations of physical and emotional abuse was not arbitrary, unreasonable or illegal. The court did not abuse its discretion by dismissing the plaintiff's administrative appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[21] The plaintiff conceded that his elder daughter bit her nails.